625 A.2d 391

**Stephen P. BOUREXIS**

v.

**The CARROLL COUNTY NARCOTICS TASK FORCE, et al.**

**No. 1595, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

June 3, 1993.

460

Judith S. Stainbrook, Westminster (Robin Page West, Baltimore, on the brief), for appellant.

Leo W. Ottey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Columbia, for appellees, Heisler and Carroll County Narcotics Task Force.

Charles S. Fax (B. Darren Burns and Shapiro and Olander, on the brief), Baltimore, for appellee, McKendrick.

Argued before WILNER, C.J., MOTZ, J., and ROSALYN B. BELL, Judge (Retired) Specially Assigned.

WILNER, Chief Judge.

Appellant is an attorney who practices in Carroll County. In June, 1992, he filed a 14–count complaint in the Circuit Court for that county against "The Carroll County Narcotics Task Force, a.k.a. Drug Enforcement Bureau," Andrew McKendrick, and Robert Heisler. Messrs. McKendrick and Heisler were sued individually and in their capacities as members of the Carroll County Narcotics Task Force.

The predicate for all 14 counts was stated in several introductory paragraphs of the complaint. Appellant averred that the Task Force "is composed of law enforcement officers from various law enforcement agencies who purport to operate under the laws of the State of Maryland" and that McKendrick and Heisler acted individually as members of that Task Force. He asserted that "[i]t is the policy and practice of the Defendants Task Force, McKendrick and Heisler" (1) "to refuse to work with persons suspected of, or arrested in connection with, drug offenses who are represented by the Plaintiff and not by other lawyers," (2) "to inform persons who have been arrested on drug-related charges that if such persons are represented by the Plaintiff that the Defendants

will discriminate against them but will not discriminate against them if they use any other attorney," and (3) "to inform the Plaintiff's existing clients that they will be discriminated against as long as they are represented by the Plaintiff." Finally, appellant alleged that

"The Defendants have adopted this policy and practice in order to damage the Plaintiff's practice by retaliating against him for his representation of certain persons who have been charged with drug-related offenses and in order to prevent him from continuing to represent persons who have been charged with drug-related offenses."

This conduct, appellant complained, deprived him of three basic rights under the Federal and State Constitutions—a property interest in his livelihood (Counts 1–4), equal protection of the laws (Counts 5–8), and freedom of speech (Counts 9–12)—and constituted as well an intentional interference with his business in violation of State common law (Counts 13 and 14). In each of these counts, appellant asked for substantial compensatory damages and an injunction to restrain the defendants from "continuing to deprive the Plaintiff of business by informing persons that they will be discriminated against if they are represented by the Plaintiff and from in fact discriminating against such persons because they are represented by the Plaintiff." In several of the counts (2, 4, 6, 8, 10, 12, and 14), appellant alleged that the conduct complained of was malicious, and in those counts he also asked for punitive damages.

The defendants answered appellant's request for an interlocutory injunction and moved to dismiss the complaint or, in the alternative, for summary judgment. The thrust of their response, and their position throughout these proceedings in both the Circuit Court and this Court, is that appellant's complaint really is that the Task Force will not negotiate plea bargains with anyone represented by him. Appellant agrees that that is essentially what he is complaining about—the refusal to "work with" his clients and the discrimination threatened or practiced is in the context of excluding them from the opportunity to obtain the benefits derived from a

plea agreement. The defense to the complaint, read in that light, is that, as appellant's clients have no legally protected right to a plea bargain or to receive favors from the Task Force, appellant can have no derivative claim when bargains or favors are denied to his clients. Apart from that, the defendants also assert that, as they are engaged in what is essentially a prosecutorial function, they are protected by the immunity applicable to prosecutors.

At a hearing on both the request for interlocutory injunction and the motions to dismiss, appellant presented evidence regarding two of his clients—Doyle Barnes and Gordon Cartnail. In an affidavit, Mr. Barnes said that after his arrest in December, 1989, he had worked out an agreement with McKendrick and the Task Force under which the Task Force would forgo seizing his car if he paid McKendrick $800 by February 1, 1990. He paid $500 but could not come up with the other $300 by February 1.[1] On February 6, he took the other $300 to McKendrick, who told him, in effect, that the deal was off and that he had already filed papers against Barnes. When he asked McKendrick if he could get the car back, McKendrick said that "as long as Bourexis is your lawyer, you can guarantee you'll never get your car back. He said that 'we will not work with you.'" When asked why, McKendrick said, "'We do not like Bourexis.'" The affidavit did not indicate what happened thereafter to Mr. Barnes— whether he worked out a plea bargain or was required to stand trial. Appellant acknowledged that he continued to represent Barnes "in the disposition of his case."

The evidence regarding Cartnail was in the form of excerpts from testimony given by Detectives McKendrick and Heisler at a proceeding to revoke Cartnail's bond. Under cross-examination by appellant, McKendrick admitted cancelling a deal with Cartnail. He initially said "I told him that if he

---

1. This was the only evidence regarding the payment of money to a member of the Task Force. The record is otherwise barren with respect to how the Task Force is funded or what happens to money paid to it by criminal defendants or others.

continued to have you as re—as his counsel, that I would not be working with him" but continued that "after the statements that were said at the end of the process, I have no intention of working with him, no matter who he has for counsel." When Cartnail asked why McKendrick would not work with him while represented by appellant, McKendrick replied that "nothing ever seems to work out when we have you as defendant's counsel," that "I told him in no uncertain terms that if you represented [him] for counsel, we would not be working with him," and that "if he had other attorneys, it would be no problem." Heisler also said, under cross-examination, that it was "probably common knowledge with everybody in the Task Force" that "we're not gonna work with anybody that's represented by you, Mr. Bourexis." Heisler said that it was a matter of policy and was nothing personal against appellant, although Cartnail gave testimony to the effect that the Task Force's policy was based on its perception that appellant was an "asshole."

Appellant himself testified at the hearing in this case. He described the process of "working with" the Task Force as essentially providing information, either directly to members of the Task Force or to other law enforcement officers who would then relay the information to the Task Force. He later added that making drug buys was also part of it. At one point he said that "[t]here are basically no promises or no commitments made" for such cooperation beyond bringing it to the attention of the prosecutor, but he later said that it might result in the prosecutor agreeing "not to allocute at sentencing" or to reduce charges. He acknowledged that some of his clients have chosen as a matter of strategy not to cooperate with the Task Force, and that that has not prevented him from working out plea bargains with the State's Attorney. He offered some conclusory evidence, devoid of detail, that his practice had suffered because of the Task Force policy of not "working with" his clients. He did not assert that any particular client had terminated his services because of the Task Force's policy or that any particular prospective client failed to retain him on account of the policy.

Upon the evidence presented and the memoranda filed by the parties, the court entered an order on September 30, 1992, treating the motions to dismiss as motions for summary judgment under Md.Rule 2–322(c), granting those motions, and denying injunctive relief. In various "Whereas" clauses, the court concluded that (1) the Task Force was "not a legal entity" and had no "entity status upon which it can be sued," (2) the prosecutor member of the Task Force, with the advice of the police members, had "full discretion ... to deem a particular criminal defendant untrustworthy-by-association and to choose not to enter plea negotiations," (3) no one had a "legal right or property interest in negotiating plea agreements," (4) Counts 1 through 4 of the complaint failed to allege sufficiently a deprivation of a property interest, (5) Counts 5 through 8 failed to allege sufficiently a violation of equal protection of the laws, (6) Counts 9 through 12 failed to allege sufficiently a violation of appellant's freedom of speech, (7) Counts 13 and 14 failed to allege a cause of action "in that those counts only allege a willful or malicious conduct in communicating to persons in order to cause damage," and (8) "some government immunity applies."

In this appeal, appellant attacks each of those conclusions. He argues that the Task Force *is* an entity that may be sued, that the police members do *not* have the immunity available to a prosecutor and are not immune from suit, that his complaint *did* state causes of action, and that he *was* entitled to an injunction. The defendants, of course, believe that the trial court was right on target. McKendrick continues to view the Task Force's role as part of the prosecutorial plea bargaining process, thereby cloaking all of its members with a prosecutorial immunity. Heisler does not repudiate that approach but asserts further immunity under the Tort Claims Act. More fundamentally, they look at appellant's complaint as alleging merely a refusal by the Task Force to engage in plea bargaining and, seizing upon the pronouncement of the Supreme Court in *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), that there is no constitutional right to a plea bargain, urge that, as appellant's clients have no protect-

ed right to a plea bargain, appellant has no cognizable claim when the Task Force refuses to enter into such bargains with his clients.

### *Status Of The Task Force*

■ Before considering the heart of this case, we shall briefly address the status of the Task Force. As noted, it was a named defendant in the complaint. The only allegation as to its nature and status, however, is that it is located in Carroll County and "is composed of law enforcement officers from various law enforcement agencies who purport to operate under the laws of the State of Maryland." No evidence regarding its organization, governance, powers, financing, or property was offered. It was described by defense counsel as "a cooperative effort" between the Westminster City Police and the Maryland State Police or a "duty assignment." There is nothing in the record to indicate whether it even has an office, employees, stationery, or a telephone number. In short, there is nothing to show it is an entity that may be sued.

Appellant points to Md.Code Cts. & Jud.Proc. art., § 6–406(a), which provides that "[a]n unincorporated association, joint stock company, *or other group which has a recognized name* may sue or be sued in the group name on any cause of action affecting the common property, rights, and liabilities of the group." (Emphasis added.) This statute, he says, allows a group with a recognized name to be sued in an action affecting the rights and liabilities of the group, and that, he claims, is what his action involves.

Section 6–406 was derived from former Md.Code art. 23, § 138, which provided that "[e]very unincorporated association or joint stock company having a recognized group name may sue or be sued in such group name in any action affecting the common property, rights and liabilities of such association or joint stock company." Article 23 was the article dealing with corporations, and § 138 was part of the subtitle of that article governing non-stock corporations. When, as part of the gen-

eral code revision process, the General Assembly enacted the Corporations and Associations article in 1975 (1975 Md.Laws, ch. 311), most of article 23, including the balance of the subtitle on non-stock companies, was transferred to that new article. Section 138, however, was rewritten in the standard code-revision language and, by separate bill (1975 Md.Laws, ch. 378), was transferred to the Courts and Judicial Proceedings article, probably because it dealt more with judicial proceedings than with the substantive law of corporations and associations.

In rewriting the section, the General Assembly added the phrase "or other group" to the two kinds of entities—unincorporated associations and joint stock companies—included in the repealed provision. There is no indication that any substantive change was intended, however. The title to the bill, which limits its permissible scope (Md. Const., art. III, § 29), states that it is:

"For the purpose of transferring certain provisions relating to unincorporated associations, joint stock companies, and other groups from one article of the Code to another; changing style and punctuation; repealing certain obsolete provisions relating to certain proceedings by or against certain groups; and correcting cross references to those provisions."

Especially in light of this title, we do not read ch. 378 or the language it enacted as expanding the kinds of unincorporated entities that may be sued in their group name to include amorphous groups having no clear separate identity, simply because they have a group name. And *on the record in this case*, we do not believe it includes the Carroll County Narcotics Task Force. We therefore find no error in the judgment in favor of the Task Force.

### Right To Plea Bargain

The principal defense, apart from immunity, is that, because appellant's clients have no right to a plea bargain, he has no cause of action because the members of the Task Force refuse

to engage in plea bargaining with his clients. There are a number of responses to that argument.

The only individual defendants sued are the two police officers who have refused to "work with" appellant's clients. Because they see some succor in a brief pronouncement in *Weatherford v. Bursey, supra,* 429 U.S. 545, 561, 97 S.Ct. 837, 846 that "there is no constitutional right to plea bargain," the officers regard themselves as part of the plea bargaining process. That, indeed, lies at the heart of their defense. Before addressing that supposition, we need to look at *Weatherford* in its proper context.

Weatherford was an undercover police agent. He, Bursey, and two others vandalized a Selective Service office in South Carolina. To maintain his cover, Weatherford was arrested and charged along with Bursey. Unaware that Weatherford was a police officer, Bursey and his lawyer invited him to participate in some strategy sessions. Weatherford did not ask to participate and did not solicit any information from Bursey; indeed, he said that he intended to seek a severance because of Bursey's past record. The prosecution did not initially intend to use Weatherford as a witness, but by the eve of trial his undercover status had become attenuated, and so he was called and testified. Following his conviction, Bursey filed an action in Federal court under 42 U.S.C. § 1983, alleging that Weatherford had communicated information to his superiors and thereby deprived Bursey of the effective assistance of counsel and due process of law. The District Court entered judgment for the defendants, finding, among other things, that Weatherford had *not* communicated to his superiors any information learned from Bursey. The Court of Appeals for the Fourth Circuit reversed, concluding that Bursey's rights to the effective assistance of counsel and a fair trial had been violated.

The thrust of the Supreme Court's Opinion dealt with that issue, the Court ultimately concluding that Bursey's rights had not been violated. It declined to adopt a *per se* rule prohibiting this kind of undercover operation, and it rejected Bursey's

complaint that the government had violated his right to discover the identity of an informant. Indeed, the principal holding in the case, for which it is most often cited, is that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* [*v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] did not create one." 429 U.S. at 559, 97 S.Ct. at 845. In its concluding paragraph, the Court addressed, and rejected, a concern expressed by the Fourth Circuit court:

"The Court of Appeals suggested that Weatherford's continued duplicity lost Bursey the opportunity to plea bargain. But there is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial. It is a novel argument that constitutional rights are infringed by trying the defendant rather than accepting his plea of guilty."

*Id.* at 560–61, 97 S.Ct. at 846.

This is a thin strand, indeed, on which to hang the heavy notion that it is permissible for prosecutors and police officers to engage in categorical discrimination based on who the defendant's lawyer happens to be, simply because they do not like the lawyer. One court has expressed the thought that "[b]ecause a defendant is not constitutionally entitled to a plea offer, no constitutional rights are connected to the plea bargaining process." *Winokur v. State,* 605 So.2d 100, 102 (Fla. App. 4 Dist.1992). That is clearly not the case. It is a constitutional mandate that a guilty plea induced by a plea bargain be knowing, intelligent, and voluntary and that the record demonstrate that fact (*Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)), that the defendant have been afforded the assistance of counsel during the plea bargaining process (*Moore v. Michigan,* 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167 (1957)), and that the State carry out its obligations under any plea bargain it makes (*Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971)). *See also Wilson v. U.S.,* 606 A.2d 1017 (D.C.App.1992). More broadly, the Supreme Court pointed out in *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604, *reh. denied*

*sub nom. Browder v. Director, Department of Correction of Illinois,* 434 U.S. 1089, 98 S.Ct. 1286, 55 L.Ed.2d 795 (1978), that the discretion possessed by prosecutors in the plea bargaining process is *not* without limitation. 434 U.S. at 365, 98 S.Ct. at 669, it said: "There is no doubt that the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse. And broad though that discretion may be, *there are undoubtedly constitutional limits upon its exercise.*" At 365, 98 S.Ct. at 669, the Court, quoting in part from *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), noted that " 'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, *or other arbitrary classification.*' "

■ We reject, therefore, the notion that, because no individual defendant has a constitutional right to insist upon the offer of a plea bargain, police officers and prosecutors can engage in categorical discrimination based on "arbitrary classifications." We raised the question at oral argument, and did not get a clear or satisfactory response, as to whether prosecutors or police officers could refuse to enter into plea negotiations with defendants solely because of the race, gender, or religion of their attorneys (or indeed of the defendants). The rigid proposition espoused by appellees would require an affirmative answer to that question, but counsel appeared to recognize, as the Court certainly did, the irreconcilable conflict between such an answer and the very bedrock of our jurisprudence. The answer cannot be "yes," and so the proposition, as put, cannot be valid.

■ We are unaware of any other case in the country involving precisely this situation, and none has been cited to us. We have discovered, however, two cases that provide some guidance and to which the Carroll County Narcotics Task Force and its advisors may wish to give some thought. The first is *Complaint of Rook,* 276 Or. 695, 556 P.2d 1351

(1976), where the Oregon Supreme Court disciplined a local prosecutor for violating the Code of Professional Responsibility by offering a plea agreement to one group of defendants but refusing to make a similar offer to other defendants, similarly situated, solely because they had a different lawyer who was not to the prosecutor's liking.

The second is *Boulas v. Superior Court*, 188 Cal.App.3d 422, 233 Cal.Rptr. 487 (1986). A defendant, Boulas, desiring to work out a plea agreement, was told by the prosecutor that he would first have to discharge his current attorney and retain one more to the prosecutor's liking. After rejecting several nominees proposed by the defendant, the prosecutor essentially steered him to an acceptable lawyer, but that lawyer refused to take the case. Boulas eventually rehired his initial attorney, who, upon learning what had occurred, filed a motion to dismiss the case on the ground of prosecutorial misconduct. The trial court, though concluding that Boulas's rights had been violated, nonetheless denied the motion on the ground that he had not been prejudiced and that he could be protected by exclusion of any information gleaned by the prosecution as a result of its interference. The California Court of Appeals reversed, declaring that the motion should have been granted. In reaching that conclusion, the Court held that the prosecutor was "obligated to give due respect to, and to preserve, Boulas's choice of counsel," that his course of conduct "actively caused irremediable harm to Boulas's relationship with his attorney and was, therefore, improper," and that "[t]he intentional undermining of an individual's right to counsel of his own choosing cannot be countenanced under any rational standard of justice." 188 Cal.App.3d at 433, 434, 233 Cal.Rptr. 487. It thus stated, at 434, 233 Cal.Rptr. 487:

> "No relief, such as suppression or reversal of conviction, would remedy the violation. Furthermore, considering the extent and seriousness of the conduct of those in positions of authority and public trust, we find the grave sanction of dismissal to be the sole appropriate remedy for intentional and calculated violation of Boulas's rights. We find the government conduct in the present matter to be outrageous

in the extreme, and shocking to the conscience; we are, thereby, compelled to order the dismissal of the present case."

Our rejection of the notion that *Weatherford* allows the Task Force or its members to engage in whatever discrimination they choose does not end the inquiry. We have a particular complaint, supplemented by the evidence adduced at the hearing, and it is that which frames the issues before us.

Unlike Boulas, appellant is not a criminal defendant asserting that the prosecutor, or police officers associated with the prosecutor, have interfered with *his* right to counsel or to a fair trial. The essence of his grievance is that the defendants have interfered with his occupational opportunities by making him less desirable to have as a lawyer. There is no contention by him, however, either in his complaint or in the evidence offered at the hearing, that any client of his or any prospective client of his has actually been denied the opportunity to negotiate a plea agreement or has been denied terms of a plea agreement offered to other defendants. There is no contention, and no evidence, that either the refusal of the two police officers to "work with" his clients or any other discrimination practiced by them has caused the prosecutor to treat appellant's clients any differently than he or she has treated other defendants in terms of charging or of offering or negotiating plea agreements. Indeed, appellant testified that he had, in fact, worked out plea agreements for some of his clients despite the policy of the Task Force. Nor, as we have noted, has there been any specific allegation, or evidence, that he has lost any client or prospective client or that he has been required to charge less in fees than he otherwise would have charged because of the Task Force policy. In short, he has alleged conduct that may be wrongful to others but none that has wronged *him*.

It is for that reason, and that alone, that we affirm the judgment entered below. We shall, however, in the exercise

of our discretion, assess the costs of this appeal against appellees.

JUDGMENT AFFIRMED;

APPELLEES TO PAY THE COSTS.