**SAVE–A–PATRIOT FELLOWSHIP, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civil Action No. MJG–95–935.**

United States District Court, D. Maryland.

Dec. 18, 1996.

Beverly A. Moses, Trial Attorney, Tax Division, U.S. Dept. of Justice, Washington, DC, for Plaintiff.

George E. Harp, Shreveport, LA, for Defendant.

### MEMORANDUM OF DECISION

GARBIS, District Judge.

This case was tried before the Court without a jury. The Court has heard the evidence, reviewed the exhibits, considered the materials submitted by the parties and had the benefit of the arguments of counsel. The Court now issues this Memorandum of Deci-

sion as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

At all times relevant to this case, the Save–A–Patriot Fellowship ("the SAP Fellowship") has been based in a rented facility at 12 Carroll Street ("the Office") in Westminster, Maryland. Mr. John B. Kotmair, Jr. ("Kotmair"), was the founder and is the leader (called the "Fiduciary"), of the SAP Fellowship, Kotmair resides at 2911 Groves Mill Road ("the Residence") in Westminster, Maryland.

On December 10, 1993, the Internal Revenue Service ("I.R.S.") executed search warrants at the Office and the Residence in connection with an investigation of Kotmair. The execution of the search warrants resulted in litigation by Kotmair seeking the return of a vial of Holy Qettorett [1] allegedly seized by the I.R.S. in the raid. *Kotmair v. United States*, MJG–94–447. The Court decided, in the *Kotmair* case, that the Plaintiff had not established that the substance had been taken by the I.R.S.[2]

The instant case, which involves subject matter more mundane than Holy Qettorett, is brought by the SAP Fellowship. In the December 10, 1993 raid, the I.R.S. seized at the Office various documents, computer disks, files, papers, and other materials relating to the operations of the SAP Fellowship. There was also seized at the Office $384 of currency, 40 Susan B. Anthony dollars, and 5 money orders valued at $210.[3]

At the Residence the I.R.S. seized various papers and the following items:

1. The sum of $44,115 of U.S. currency found in one location in the safe.
2. The sum of $377 of U.S. currency found in another location in the safe.
3. Various numismatic coins and items found in the safe and elsewhere in the Residence.

The items seized in the raid were taken by the Criminal Investigation Division of the I.R.S. for use in a criminal investigation. On December 22, 1993, the I.R.S. Collection Division served a Notice Of Levy on the Criminal Investigation Division so as to take the $44,115 in currency for application to the outstanding tax liabilities of Kotmair. On September 2, 1994, the Collection Division levied upon the remainder of the above-mentioned seized property for application to the tax liabilities of Kotmair.

The SAP Fellowship filed this law suit on March 29, 1995, a date beyond the nine month limitation period [4] following the December 22, 1993, levy but within nine months of the September 2, 1994, levy. By Memorandum and Order of May 10, 1996, this Court dismissed the Plaintiff's claim as to the $44,115 in currency due to the expiration of limitations. There remained for trial the SAP Fellowship's claim to the assets levied upon on September 2, 1994.

## II. NATURE OF THE CASE

As stated in Saltzman, "IRS Practice and Procedure," ¶ 15.07 [2][a] (2nd ed.1991):

"In general, if a levy has been made on property ... any person other than the

---

1. The sacred substance used in the Temple prior to its destruction and, some believe, necessary to sanctify the Temple upon its reconstruction so that the Messiah can perform prophesied miracles upon his/her return.

2. In the *Kotmair* case, the Plaintiff presented the testimony of Professor Vandyl Jones who claimed to be the original for "Indiana Jones." Professor Jones, was, in fact, searching for the Ark of the Covenant and actually found the ancient "factory" at which the Israelites manufactured and stored Holy Qettorett for Temple use. He found stored there a large quantity of "Holy Qettorett mix" needing only the addition of Sodom Salt and other ingredients. Dr. Jones en-

trusted a small vial of the substance to a "follower" of Kotmair, Scott Hucklebee, who brought it to America. However, the Court did not find that the vial was in the Residence at the time of the raid. Also, there was a sufficient supply left in Israel for use if, and when, needed so that the loss of the Hucklebee vial would not cause irreparable harm.

3. In the search warrant return this is described as "APPLICATION & 4 MO—$175." The $210 value is found because it is used in the parties' Joint Statement of Facts.

4. 26 U.S.C. 5 6532(c)(1).

taxpayer [against whose tax liability the levy was made] who claims (1) an interest in or lien on the property and (2) that the property was wrongfully levied upon by the Service may bring a civil action directly against the United States in federal district court."

The statutory authority for a wrongful levy action is provided by Section 7426 of the Internal Revenue Code. See 26 U.S.C. § 7426. In a wrongful levy action the underlying assessment against the taxpayer (here Kotmair) is "conclusively presumed to be valid." § 7426(c) Hence, the only issue in the case is whether or not the subject property is the property of the wrongful levy claimant (here the SAP Fellowship).

## III. DISCUSSION

### A. The SAP Fellowship Activities

The SAP Fellowship has been proven to exist, have members, and to function. The organization has assets, leases property, has a defined membership, publishes a newsletter, and has produced at least one video tape program, twelve hours of "Just The Facts." [5]

There is no doubt that Kotmair is the major figure in the SAP Fellowship. As far as the Fellowship is concerned, he is, as Theodore Roosevelt aspired to be [6], "the corpse at every funeral, the bride at every wedding and the baby at every christening."

The SAP Fellowship operates without any written governance structure or financial records. Operating assets, such as files, equipment etc. are located at the Office. Money,

money orders, and other valuables are received at the Office, but not kept there. Kotmair is free to, and does, take funds from the SAP Fellowship for personal use. However, the evidence does not disclose that Kotmair maintained a high standard of living or that such funds as were accumulated were necessarily his personal hoard.[7]

The SAP Fellowship describes itself[8] in the following terms:

> The SAP Fellowship is a national organization of American patriots who have joined together to resist the illegal actions of the IRS and other government agencies who would attempt to deceive the public.

The evidence, including testimony and a recent (Fall of 1996) membership newsletter, "Reasonable Action," establishes that the SAP Fellowship has organizational activities, including the providing of "information" regarding tax procedures[9], views on the U.S. Constitution, and similar matters. The Fellowship offers for sale, or in its lingo "exchange for FRNs"[10], various publications as well as video tape programs and audio recordings. The material includes its own publications, an 1828 dictionary[11], a deposition of an F.B.I. Agent and a tape of the motion picture "Harry's War"[12] in which a citizen victimized by unscrupulous I.R.S. employees obtains an armored vehicle and takes on, and wins over to his viewpoint, the U.S. Army.

The Fellowship also offers the written works of Irwin A. Schiff who calls himself

---

**5.** That is the "facts" according to the Fellowship as led by Kotmair.

**6.** As stated by Alice Roosevelt Longworth, Theodore Roosevelt's daughter.

**7.** The SAP Fellowship claims that the $44,115 "hoard" was set aside for Fellowship use, noting that it has engaged in expensive activities, such as the production of the "Just The Facts" video tape. The Court makes no finding as to this contention in view of the denial of the claim for these funds on limitations grounds.

**8.** See the SAP Fellowship Program Agreement.

**9.** For example, a "press release" stating that a Washington State attorney had concluded that

the I.R.S. has no authority to seize property in that state for income tax liabilities of "most citizens." This conclusion, it is said, was presented to, and not refuted by, the Washington State Bar Association and Attorney General.

**10.** Presumably Federal Reserve Notes since the Fellowship has an unorthodox view of "dollars."

**11.** Useful, presumably, in supporting arguments as to the original meaning of words in the Constitution and related documents.

**12.** The Court notes that the actor Edward Herrman played the role of a grass roots tax protestor in "Harry's War" and, more recently, the role of the President of the United States in "Pandora's Clock."

"America's leading untax expert." [13]    Schiff can be viewed as a "prophet" of the tax protester movement and a "guru" for Kotmair.    Although convicted of tax felonies [14] and out of step with legal reality (as seen by federal judges), Schiff presents a most entertaining view of the tax law.    He has been described by Judge Guerfein of the Second Circuit [15] in the following terms:

> [Schiff] was in the insurance business.    He also fancied himself a "constitutionalist", an extremist who reserved the right to interpret the decisions of the supreme court as he read them from his layman's point of view regardless of and oblivious to interpretations of the judiciary.    One can describe his attitude either as contumacious of governmental authority for the purpose of advancing the common weal, or as that of a clever faker who used his own distortions of the Constitution as a flimsy excuse for failing to pay his income taxes.

In addition to affording its membership access to the philosophy of Irwin Schiff and his disciples, the Fellowship offers a program by which, supposedly [16]:

> Fellowship members pledge to reimburse other members for losses of cash or property incurred from illegal confiscation by the IRS and/or their nasty little brothers in state governments.    This is done by spreading the reimbursement costs to all members.

Essentially, when a member suffers a "qualified" loss of property or freedom, he/she submits a claim to the SAP Fellowship which, after validation, supposedly results in reimbursement for civil losses (to a $150,000 maximum) and a stipend of $25,000 per year of incarceration.    The payments are to be made by the membership directly to the validated claimant or the claimant's family.

A civil claim is validated:

> . . . only after S.A.P. has determined that a judgment does exist and that the claimant, to the best of his ability, dragged the plunderers through every agency and court proceedings feasibly possible, using delaying tactics in each and everyone.

A criminal claim is validated:

> . . . only after S.A.P. has determined that the claimant member is actually incarcerated and is given physical proof that said member, to the best of his/her ability, resisted and delayed the tyrants at every step through the criminal investigation and all other agency and court proceedings feasibly possible.

The Fellowship also conducts activities for its "Independent Representatives." [17]    For example, in October of 1996, the Fellowship offered a series of seminars for members, a Saturday night meeting open to the public, a Sunday social and, as a highlight of the function, the wedding of two of the Independent Representatives.[18]

### B.    The SAP Fellowship Is An Unincorporated Association

■    The Government contends, at the threshold, that the SAP Fellowship is not an organization at all, but is solely a name used by Kotmair for his own "sole proprietorship" operation.    The Court does not agree, even though it is readily apparent that Kotmair is the major figure in the Fellowship.

As noted above, the evidence established that there is an organization and not simply an operation by Kotmair personally.    The SAP Fellowship, and not Kotmair personally, leased the Office.    There are members, other than Kotmair, who engage in Fellowship ac-

---

13.    See the dust jacket to Irwin A. Schiff *How Anyone Can Stop Paying Income Taxes* (Freedom Books 1982).

14.    *United States v. Schiff,* 801 F.2d 108 (2nd Cir.1986), *cert denied.*    480 U.S. 945, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987)

15.    Schiff in *United States v. Schiff,* 612 F.2d 73, 75 (2nd Cir.1979) (reversing conviction of tax crimes and remanding for new trial).

16.    The Court is *not* finding that the program operates as asserted, but only that such a program is presented to members.

17.    Presumably, its membership or a class of members.

18.    Kotmair's role in the nuptials is not specified.

tivities. This Court observes, also, that the I.R.S. itself, quite appropriately, returned to the Office the operating assets seized from the Office (other than cash and numismatic items). These assets, at least some of which had more than nominal value, were simply (and correctly) assumed to be Fellowship property, as distinct from Kotmair's personal property.

The Government's arguments regarding the absence of a written instrument of governance is noted but, in the context of this case, is not determinative. Moreover, the absence of records and record keeping, while significant in terms of the ability of the SAP Fellowship to carry its burden of proof does not overcome the evidence establishing that there is an actual unincorporated association distinct from its members.

In sum, the Court finds as a fact: that the SAP Fellowship is an unincorporated association (not just an alter ego or sole proprietorship of Kotmair), has members, and does things through persons in addition to Kotmair.

### C. *An Unincorporated Association In Maryland Can Own Property*

■ The Government's second line of defense is that even if the evidence established that the SAP Fellowship is recognized as an unincorporated association, such an entity *cannot* own property as a matter of law.

There is little precedent—in Maryland law or elsewhere—regarding property ownership by unincorporated associations. Presumably, those organizations that have significant assets find it beneficial to formalize their status, as a corporation, trust or other entity. However, the Court can take judicial notice of the fact that there are a multitude of unincorporated associations that function in spite of their informality. For example,

there are many PTA's and other affiliations of persons with common interests that have not formalized their existence. Who would, sensibly, argue that a PTA treasury cannot be the property of the PTA?

While the situation may be different in some other jurisdictions [19] in Maryland the legislature has recognized that an unincorporated association can own property in its own right.[20]

The Maryland Code, Md. Cts. & Jud. Proc. Code Ann. § 6–406 provides:

> An unincorporated association ... or other group which has a group name may sue or be sued in the group name on any cause of action affecting the common property, rights and liabilities of the group.

Moreover, Md. Cts. & Jud. Proc.Code Ann. § 11–105 provides:

> In any cause of action affecting the common property, rights and liabilities of an unincorporated association, or other group which has a recognized group name, a money judgment against the group is enforceable *against the assets of the group as an entity,* but not against the assets of any member.

This Court concludes that, as a matter of law, an unincorporated association in Maryland can own property.

The Government's reliance upon *Bourexis v. Carroll County,* 96 Md.App. 459, 625 A.2d 391 (1993), is misplaced. The Maryland Court of Appeals did not hold that an unincorporated association *cannot* own property. Rather, it held that in *Bourexis,* in which there was no evidence offered as to the "governance, powers, financing, or property" of the organization, there was "nothing to show it [was] an entity that may be sued." *Id.* 625 A.2d at 395.

---

**19.** For decisions holding that an unincorporated association cannot own property, see *Krumbine v. Lebanon County Tax Claim Bureau,* 541 Pa. 384, 663 A.2d 158, 160 (1995) (real property); *Rock Creek Gardens Tenants Assoc. v. A.M. & L.A. Ferguson,* 404 A.2d 972 (D.C.App.1979) (per curium) (real property); *United States v. Thevis,* 474 F.Supp. 134, 138 (N.D.Ga.1979); *Libby v. Perry,* 311 A.2d 527, 531–32 (Me.1973). *But See Loving Saviour Church v. United States,* 556 F.Supp.

688, 690 (D.S.D.1983) (holding that an unincorporated association is a legal entity and therefore can own property).

**20.** Compare, *Motta v. Samuel Weiser, Inc.,* 768 F.2d 481, 485–86 (1st Cir.1985) (stating that "[c]ourts may determine that ownership vests in the individuals who comprise the organizations.")

For reasons stated herein, this Court concludes that the SAP Fellowship is an unincorporated association and, as such, is legally capable of owning property. It is, therefore, necessary to determine the extent to which the SAP Fellowship has carried its burden of proving that it owned the property at issue.

### D. What Did The Fellowship Prove It Owned?

■ The SAP Fellowship chose not to maintain any bank accounts or even maintain records of its finances. That decision may well be consistent with the group's philosophy.[21] The absence of bank accounts or records may also, whether as a deliberately sought "benefit" or not, make it more difficult for law enforcement to investigate its activities. Whatever the reasons for an absence of records—be they philosophical or otherwise—the decision has a price which goes beyond the inability to earn interest on bank deposited funds. That price certainly includes the inconvenience that results when the Fellowship finds itself involved in a legal proceeding in which it has the burden of proof.

In this case, had the SAP Fellowship had its own bank account in which it maintained its funds it might have little problem in prevailing as to those funds.[22] Similarly, although perhaps less conclusively, had the SAP Fellowship maintained records of its funds and had Kotmair as Fiduciary keep the association funds completely separate from his own, the Fellowship would have at least a possibility of carrying its burden of proof. However, the Fellowship presents no records whatsoever. Nor does the evidence establish that its funds were maintained separately from those of Kotmair. And, most significantly, there is no evidence from which the Court can determine at what point after Fellowship funds leave the Office in the possession of Kotmair that they cease to be held exclusively as the property of the SAP Fellowship.

The record establishes that Kotmair was entitled to, felt free to, and did, take funds from the Fellowship and use them for his personal sustenance. Kotmair espouses a doctrine that would have funds that he takes to spend for personal use remain the property of the SAP Fellowship. Indeed, in the world according to Kotmair, if he uses Foundation funds for his food, the Foundation ownership extends to the food even as it proceeds through his digestive system. For example:

> THE COURT: [W]e are trying to get an understanding of when something belongs to you and when it doesn't. When it belongs to [the SAP Fellowship], so I just want you to try and help me understand that. If you go to the grocery store and you buy Wheaties [with fellowship funds], when is it yours, after you eat it or.
>
> Kotmair: That is a hard question to answer.
>
> THE COURT: That is why we ask it.
>
> Kotmair: If the energy from it goes to the Fellowship, and it does, I would say it is to the benefit of the fellowship.

The Court declines to follow the "logic" of Kotmair's position or to dwell upon the point in the digestive process at which Kotmair would agree that the I.R.S. could effect collection. Rather, the Court must conclude that once Kotmair takes Fellowship funds for personal use, those funds can no longer be found to be Fellowship property immune from levy for Kotmair's tax liabilities.

The Court finds from the evidence that the SAP Fellowship obtained, and had ownership of, the cash and money orders it received for memberships and the sales of goods, and, possibly services. If the Fellowship had established that Kotmair's possession of particular assets was *solely* as Fiduciary for the SAP Fellowship the ownership could remain in the Fellowship. However, at such point as Kotmair took the assets and did not place

---

**21.** The Fellowship appears to have a distrust of banks.

**22.** Compare *Arth v. United States*, 735 F.2d 1190, 1193 (9th Cir.1984), in which the claimant's

them in a location[23] that was *exclusively* used for the maintenance of Fellowship assets, the ability of the SAP Fellowship to establish ownership in this case was lost. In the context of this case, once the cash and money orders were taken from the Office and placed in something other than a Fellowship depository, the funds were available for the immediate personal use of Kotmair, mingled with his own assets, and no longer had the character of Fellowship assets sufficient to avoid levy.

In this case, the cash and money orders that had been removed from the Office prior to the raid were found in the Residence in various locations, none of which have been established to be exclusive association depositories. However, the Court finds that the $384 of cash, the $210 of money orders and $40 of Susan B. Anthony Dollars found at the Office were, when found, property of the SAP Fellowship which had not yet been mingled with Kotmair's personal assets. Accordingly, the Court concludes that the SAP Fellowship has carried its burden of proof and proven ownership with regard to these assets found in the Office, but not as to the cash and money orders found in the Residence.

The evidence regarding the numismatic items is not sufficient to permit any finding for the SAP Fellowship. There are references in the evidence to some association receipts of numismatic items. But, there is an absence of specific evidence relating to any particular item sufficient to carry the burden of proof. Moreover, the evidence is not adequate to establish that any of the numismatic items were maintained in a location that can be found to be a Fellowship depository. There was no record of which items belonged to the association. And, there was nothing, not even a sign, a label, a wrapping, or anything else that would indicate that the ownership of the items was other than that of Kotmair in whose home the items were found. Accordingly, the Court cannot find for the Plaintiff with regard to the numismatic coins and items.

### IV.  COSTS AND LEGAL FEES

The history of this case, and the related litigation, leads the Court to address the matter of costs and legal fees at this point to avoid further proceedings. The Court has found for the Plaintiff in part and the Defendant in part. Therefore, the parties shall bear their own respective costs.

To the extent that the Plaintiff has prevailed, the Government had a reasonably justified position. Accordingly, there shall be no award of legal fees.

### V.  CONCLUSION

For the foregoing reasons:

1.  The Court determines that the Plaintiff, the SAP Fellowship, is entitled to recover the $384 in currency, $40 in Susan B. Anthony Dollars, and $210 in money orders seized from the Office and levied upon to satisfy the tax liabilities of Kotmair on September 2, 1994.

2.  Judgment shall be entered by separate Order awarding the Plaintiff a recovery of $634, plus interest thereon as provided by law, the parties to bear their own respective costs.

---

funds were deposited into the taxpayer's account and were held to have properly been levied upon.

**23.** Be it an office, a safe, a designated part of a safe, or other container plainly labeled to show Fellowship ownership and rigorously kept as Fellowship property.