858 A.2d 497

**UNIVERSITY OF MARYLAND EASTERN SHORE**

v.

**Anthony F. RHANEY, Jr.**

**No. 2583, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Sept. 27, 2004.

Jessica V. Carter (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Appellant.

Ernest I. Cornbrooks, III (Webb, Burnett, Jackson, Cornbrooks, Wilber, Vorhis & Douse, L.L.P., on brief), Salisbury, for Appellee.

Panel: MURPHY, C.J., DAVIS, HOLLANDER, SALMON, JAMES R. EYLER, SONNER,* KENNEY, ADKINS, KRAUSER, BARBERA, SHARER, and CHARLES E. MOYLAN, Jr. (Retired, specially assigned,), JJ.

MURPHY, Chief Judge.

This appeal from the Circuit Court for Somerset County arises out of an assault that occurred at approximately 7:00 p.m. on October 29, 1998 in a dormitory room on the campus of the University of Maryland Eastern Shore (UMES). Both the perpetrator (one Ennis J. Clark) and the victim of the assault, Anthony F. Rhaney, Jr., appellee, were UMES students and shared the dormitory room where the assault took place. This was not the first assault that Mr. Clark committed on the UMES campus. He had been suspended during the spring semester of 1998 because of his involvement in a series of fights that began on March 13th and continued until the 14th. At the time of his suspension, he was told that he would be permitted to return "on probation" for the fall semester, provided that he furnished "documentation of having completed professional counseling on conflict resolution." Before returning, Mr. Clark successfully completed a "conflict resolution" program, but he did not receive "professional" counseling.[1]

## Pretrial Proceedings

On October 27, 2000, appellee filed a four count complaint against Mr. Clark and the State of Maryland, University of Maryland Eastern Shore, appellant. The two counts against appellant (Count III and Count IV) asserted that appellant was negligent for the following reasons:

---

* Sonner, J. participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

1. UMES's Student Code of Conduct differentiates between "counseling by qualified professionals" and "special classes or conferences on anger management." *See* 31 UNIVERSITY OF MARYLAND EASTERN SHORE STUDENT CODE OF CONDUCT: STUDENT JUDICIAL MANUAL, *Sanctions* 11, 12 (2003)

29. [Appellant] was negligent in that it failed to disclose to [appellee] that his roommate, [Clark], had dangerous and violent propensities, which were known to [appellant] or its agents, servants, and employees. The likelihood of an assault by Clark on [appellee], or others, was foreseeable.

30. [Appellant] was further negligent in that it assigned [Clark] to be a roommate of [appellee], under circumstances when it knew or should have known that [Clark] had dangerous propensities including a history of assault.

31. [Appellant] breached its duty of reasonable care by permitting [Clark] to be in proximity to [appellee], and as a result of the negligence of [appellant], [appellee] was injured and sustained damages.

\* \* \*

35. [Appellant] is an institution of higher learning maintaining a campus at Princess Anne, Somerset County, Maryland, for the purpose of educating and housing students, among its other functions.

36. [Appellee] was properly enrolled as a full-time student and residing in a dormitory provided by [appellant].

37. While lawfully on the portion of the premises to which he was invited and expected to be by [appellant], [appellee] was assaulted and battered by [Clark] as set forth above.

38. [Appellee] was an invitee of [appellant's] property, and [appellant] breached its duty of reasonable and ordinary care to maintain the premises safely for [appellee], and to protect [appellee] against injury caused by unreasonable risk which [appellee], exercising due care, could not discover.

39. [Appellant] breached its duty of care by permitting [Clark] to be in proximity with [appellee]; by failing to protect [appellee] from [Clark's] dangerous propensity; and by failing to warn [appellee] of Clark's dangerous propensities.

The allegations in the complaint frame the issues before the court. *Bourexis v. Carroll County Narcotics,* 96 Md.App. 459,

473, 625 A.2d 391 (1993). Appellee's claim was based upon his standing as a tenant, and as a business invitee.[2]

Appellant filed a motion for summary judgment. During the hearing on that motion, appellant's counsel presented the following argument:

> Under Maryland law, ... there is no duty to control a third person's conduct so as to prevent personal harm to another unless a special relationship exists between the actor and the third person or between the actor and the person injured. ... The University[-]student relationship by itself ... does not constitute a special relationship.
>
> * * *
>
> The relationship between the University and Mr. Clark and Mr. Rhaney is best viewed in the context of [a] landlord[-]tenant relationship and ... there is no special duty owed by a landlord to protect [a tenant] from criminal acts of third parties committed in the common areas within the landlord's control. The duty owed is to exercise reasonable care. If a landlord knows or should know of the criminal activity he then has to take reasonable measures.
>
> * * *
>
> [Appellee] alleges that the University had prior knowledge about that fight in March, but that's the only knowledge it had of this one fight. I think that this single fight incident is not enough to give rise to a jury question. ... There is no authority in the law to support Mr. Rhaney's

---

2. The case at bar does not present the contention that the student-college relationship is a "special relationship" that imposes upon appellant different duties than are imposed upon defendants in landlord/tenant and business invitee litigation. Most jurisdictions have rejected the proposition that a college owes an *in loco parentis* obligation to its students. *See e.g. Nero v. Kansas State University*, 861 P.2d 768 (Kan. 1993), and the cases discussed therein. *Nero* involved a negligence action asserted against the university by a coed who was sexually assaulted in the student lounge of a dormitory. The sexual assault was perpetrated by a male student who had been previously convicted of—and disciplined for—committing a rape in his dormitory room. Applying a landowner-invitee analysis, the Supreme Court of Kansas reversed a summary judgment entered in favor of the university. *Id.* at 780.

contention that Mr. Clark should not have been allowed to return to the school or campus housing or [that] the University [had a duty] to keep Mr. Clark from Mr. Rhaney.

\* \* \*

Another thing I would like you to consider is [that] the position [of] the plaintiff is against the public policy the [sic] poor judgment in a fight would be that you are forever barred from University housing. I think it's an untenable thing that the University [must,] just because of one fight[,] follow Mr. Clark to protect people that he comes in contact with both in his classes or otherwise. This could create a huge burden on the State and the University.

Appellant's motion for summary judgment was denied and a jury trial followed.[3]

### The Evidence

The jury learned that appellee and Mr. Clark lived together without incident for the first two months of the fall 1998 semester. At that time, appellee was an eighteen-year-old first semester freshman, and Mr. Clark was a twenty-year-old second semester freshman. On October 29, 1998, Mr. Clark moved from the room he shared with appellee into another dormitory room, where friends of his lived. After Mr. Clark had removed most of his belongings, appellee and a friend began to rearrange the furniture in the room. They moved Mr. Clark's fish tank, which sat on top of a desk, and then noticed that the tank was leaking. As appellee set out to wipe up the leaking water, Mr. Clark returned to the room.

Appellee testified that Mr. Clark "began yelling irately with vigorous hand gestures," and asked him repeatedly what he had done to the fish tank. Appellee denied breaking it. He believed Mr. Clark was walking away from the scene, when Mr. Clark turned back and punched appellee in the jaw. Appellee underwent surgery and had his mouth wired shut for

---

3. Although the issue of Mr. Clark's liability had been resolved against him before trial, he attended and represented himself during the trial.

a period of time. He finished the fall semester, but later withdrew from UMES. Mr. Clark withdrew soon after the assault.

The jury also heard evidence regarding Mr. Clark's disciplinary history at UMES. He matriculated in the fall of 1997, and, over two days in the following semester, March 13 and 14, 1998, he was involved in fights with other students. Apparently, one altercation began at a party on the 13th and continued on the 14th in front of a campus dining hall. Eight other people were involved in the second fight, but it caused the immediate suspension of only one other student and Mr. Clark, who pled guilty to "fighting or physically assaulting another" and "disorderly conduct" at a Campus Judicial Council hearing.

UMES advised Mr. Clark that he could return for the fall 1998 semester, "with documentation of having completed professional counseling on conflict resolution." He would also be placed on probation for one year, if he returned. In June of 1998, UMES received a letter that documented Mr. Clark's participation in the "Save Our Streets" program ("S.O.S."), the goals of which were to "resolve conflict verbally, without resorting to the use of violence, to develop more favorable attitudes toward law-abiding behavior, and to make positive choices in response to conflict." Mr. Clark testified that the program was geared toward street and gang violence. It appears to have been designed for people thirteen to seventeen years old. The program required Mr. Clark to attend classes that lasted about two hours a day, for two weeks.

UMES allowed Mr. Clark to return to school, based upon his successful completion of the program. It also allowed him to live in a dormitory, where he was randomly assigned to be appellee's roommate. The dormitory contained single and double occupancy rooms.

Appellee elected to abandon his "duty to warn" theory,[4] and proceeded on his "duty to protect" theory, by (1) conceding

---

4. Appellee agreed that the Code of Federal Regulations prohibited appellant from disclosing Mr. Clark's discipline record. There is,

that it was not unreasonable for appellant to allow Mr. Clark to "come to classes, [go] to the library, [and] attend lectures," but (2) arguing that it *was* unreasonable for appellant to assign Mr. Clark and appellee to the same dormitory room. At the conclusion of the plaintiff's case-in-chief, appellant's counsel moved for judgment, arguing that (1) "the same reasons" that entitled appellant to summary judgment "are still valid today," and (2) "just because a young man is involved in one fight doesn't mean he can't ever come back to the school." These arguments were incorporated by reference in appellant's motion for judgment at the conclusion of all the evidence.

The summation delivered by appellee's counsel included the following arguments:

> Let's start with one thing the University, and they're correct, the federal law says . . . the University cannot disclose disciplinary records of students because it's a privacy thing that the people in Washington think [is] important. So they have exclusive control over the knowledge of Mr. Clark's disciplinary records.

* * *

> Now, when you have exclusive knowledge of something, confidential knowledge that you can't make known to other people, you have a special duty there because you have to make arrangements to make sure that what you know [but] what someone else can't know doesn't adversely affect another person.

* * *

---

however, a "safety of . . . other individuals" exception to the general prohibition. 34 C.F.R. § 99.36(a) provides:

> An educational agency or institution may disclose personally identifiable information from an education record to appropriate parties in connection with an emergency if knowledge of the information is necessary to protect the health or safety of the student or other individuals.

Appellee has never contended that appellant owed a duty of disclosure under this provision.

The University can't tell Mr. Rhaney or his parents about Mr. [Clark's] conduct, so they have to do something else . . . to make sure that Mr. Clark's behavior pattern does not hurt Mr. Rhaney or anybody else. And . . . they had reasonable options. They could say, Mr. Clark, yeah, you can come to classes, you can go to the library, you can attend lectures, but you can't live on on-campus housing until you've shown that you can behave yourself over a period time[,] or they can make him pay for a single room. You want to come back, you want to live in University housing[,] you pay for a single room, you live by yourself. We don't quite trust you yet because we know what your behavior pattern is. They have to act reasonably based on what they know. And they alone know about his behavior.

The judge's instructions are that the University stands in the position of a landlord and these two folks stand as tenants. There is a landlord tenant relationship there. There is also the [business-invitee] relationship. You heard the judge use the word invitee. Take it out of the University context[;] if you invite somebody to your store, . . . somebody comes [into] the store [when] you forget to put the watch dog away [and] the watch dog bites somebody, well, you haven't exercised reasonable care. You have to be reasonable when you let somebody come [into] the store for—your store property for your business.

So the University is a business. They are selling room space. They are selling lectures. They are selling degrees. They are selling courses. In essence it's a commercial transaction even though it's not the normal commercial transaction. They have to exercise reasonable care to the people they invite on their premises and to their tenants.

And the instructions are very clear on this. Here's one under Maryland law. The landlord or business owner has knowledge of or should have known of criminal activity against persons who are on its property. The landlord or business owner has a duty to take reasonable measures in view of existing circumstances to eliminate the conditions

contributing to the criminal activity. Okay. They have to act reasonably.

Prior to closing arguments, the circuit court delivered instructions that included the following propositions:

The responsibility of those who own or possess property to people injured on their property depends upon the standard of care owed to the injured person. The standard of care depends upon the injured person's status on the property.

An invitee is a person who is invited or permitted to be on another's property for purposes related to the owner's or occupier's business. The duty owed to any invitee is to use reasonable care to see that those portions of the property that the invitee may be expected to use are safe.

Under Maryland law if a landlord or business owner has knowledge of or should have know [sic] of criminal activity against persons on its property the landlord or business owner has a duty to take reasonable measures in view of the existing circumstance[s] to eliminate the conditions contributing to the criminal activity. Evidence that the landlord had knowledge or prior criminal activity on the premises and had taken various safety precautions to guard against criminal activity is relevant to determining the reasonable measures which a landlord is under a duty to take to keep the premises safe.

In Maryland there is no duty to control a third person's conduct so as to prevent personal harm to another unless a special relationship exists between the actor and the third person or between the actor and the person injured.

In determining whether the University had a special relationship with either Mr. Rhaney or Mr. Clark you should consider whether the University specifically undertook to protect Mr. Rhaney or to control Mr. Clark's conduct.

You are instructed that federal law bars the University from disclosing student disciplinary records to third parties except in very limited circumstances none of which applies

to this case. You are instructed that the University had no duty to separate [younger students] from ... older students.

The jury was not asked to return a separate verdict on each count, but was instead presented with a verdict sheet that included the following questions:

1. Do you find from the evidence presented that the University of Maryland Eastern Shore breached a duty to exercise reasonable care toward Anthony Rhaney, Jr.?

_____YES _____NO

\* \* \*

2. Do you find that the University of Maryland Eastern Shore's breach was a proximate cause of the injuries claimed by Mr. Rhaney?

_____YES _____NO

The jury answered "Yes" to both questions and proceeded to award appellee $74,385.00 in compensatory damages.[5] This appeal followed, in which appellant presents three issues for our review:

1. Did the University owe a duty to warn Rhaney about Clark before assigning them to share a dormitory room when federal law barred the University from disclosing that Clark had been involved in a fight on campus during the prior semester, for which he was disciplined in accordance with the University's student code of conduct?

2. Did the University owe a duty to protect Rhaney from Clark when the University had not taken charge or custody of Rhaney or Clark and when the University undertook no affirmative act to protect Rhaney upon which Rhaney could reasonably rely?

3. Was there sufficient evidence for the jury to conclude that the University failed to exercise reasonable care

---

5. The jury awarded $25,000 in punitive damages against Mr. Clark. The compensatory damages were assessed against both appellant and Mr. Clark.

when it assigned Rhaney and Clark to share a dormitory room?

### *Discussion*

■  The Court of Appeals recently stated:

The elements of a cause of action in negligence are well-established. To state a claim, the plaintiff must allege facts demonstrating "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Remsburg v. Montgomery*, 376 Md. 568, 582, 831 A.2d 18, 26 (2003), quoting from *Muthukumarana v. Montgomery Co.*, *supra*, 370 Md. at 486, 805 A.2d at 395. As noted in *Remsburg*, 376 Md. at 582, 831 A.2d at 26, we have adopted Prosser and Keeton's characterization of "duty" as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another," and, in determining whether a duty exists, have considered such things as,

"the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

*Id.* at 583, 831 A.2d at 26, quoting from *Ashburn v. Anne Arundel Co.*, 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986), quoting, in turn, from *Tarasoff v. Regents of Univ. of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976). In *Jacques v. First Nat'l Bank*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986), we consolidated some of that into two considerations: "the nature of the harm likely to result from a failure to exercise due care, and the relation-

ship that exists between the parties." *See also Bobo v. State,* 346 Md. 706, 714–15, 697 A.2d 1371, 1375–76 (1997).

As a general proposition, "a private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship." *Scott v. Watson,* 278 Md. 160, 166, 359 A.2d 548, 552 (1976); *Valentine v. On Target,* 353 Md. 544, 551–52, 727 A.2d 947, 950 (1999).

*Horridge, et al. v. St. Mary's County Department of Social Services, et al.,* 382 Md. 170, 182–83, 854 A.2d 1232 (2004). In the case at bar, appellee was (1) a business invitee with respect to the UMES campus, and (2) a tenant with respect to the dormitory room in which he was assaulted.

In its capacity as a landlord, appellant is not immune from liability on the ground that the tenant's injury occurred *within* the leased premises, rather than within a common area. In *Hemmings v. Pelham Wood,* 375 Md. 522, 826 A.2d 443 (2003), the Court of Appeals reaffirmed

> the proposition that a landlord's duty to maintain safe common areas is not limited to preventing harm that occurs only within the common areas. Rather, negligent maintenance of or failure to correct a known defect in areas under the control of the landlord may result in liability for injuries that occur within the leased premises.... In other words, the fact that a criminal attack occurred within a leased apartment unit does not preclude the application of the duties set forth in *Scott [v. Watson,* 278 Md. 160, 359 A.2d 548 (1976)].

*Id.* at 543, 826 A.2d 443. Our holding would not be different if Mr. Clark had assaulted appellee in a classroom, a dormitory hallway, a lecture hall, or the library.

A business owes an invitee "a duty to use reasonable and ordinary care to keep the premises safe and to protect the invitee from injury caused by an unreasonable risk, which the invitee, by exercising ordinary care for his own safety, will not discover." *Southland Corp. v. Griffith,* 332 Md. 704, 715–16, 633 A.2d 84 (1993).

"The burden is upon the customer to show that the proprietor ... had actual or constructive knowledge" that the dangerous condition existed. When another patron creates the danger, the proprietor may be liable if it has actual notice and sufficient opportunity to either correct the problem or warn its other customers about it.

*Rehn v. Westfield America*, 153 Md.App. 586, 593, 837 A.2d 981 (2003).

■ A landlord owes its tenant the duty

to take reasonable security measures to eliminate harm that is foreseeable, based on the nature of the known criminal activity **on the premises.** On the other hand, if the harm is not the sort of harm that a landlord of ordinary intelligence would associate with that criminal activity, the duty does not attach.

*Hemmings, supra*, 375 Md. at 543, 826 A.2d 443. (Emphasis added.) We must affirm the judgment in the case at bar if, under the law applicable to business invitees or the law applicable to tenants, appellant's "special duty" to appellee required that appellant prohibit Mr. Clark from sharing a dormitory room with another student. From our application of the relevant *Tarasoff* factors, we are persuaded that appellant did not breach its duty of care to appellee by assigning him and Mr. Clark to the same dormitory room.

### Foreseeability of Harm

■ "Perhaps ... the factor deemed most important is foreseeability." *Ashburn, supra*, 306 Md. at 628, 510 A.2d 1078. " 'Foreseeability' means that a person of ordinary intelligence should have anticipated the dangers that his negligence created." *Gutierrez v. Excel Corp.*, 106 F.3d 683, 687 (5th Cir.1997). The evidence of Mr. Clark's prior misconduct consisted of proof that he had been suspended for fighting on March 13, and March 14, 1998. The first fight occurred at an off-campus party. The second fight, which was apparently a continuation of the first, occurred outside a building. Neither fight occurred in a dormitory, involved the use of weapons, or

resulted in criminal charges. No evidence was presented that Mr. Clark had ever assaulted or threatened to assault any of his roommates.

This Court has rejected the proposition "that henceforth from appellant's conviction of lottery offenses ... he traveled the streets enveloped in probable cause which was apparent to any officer who had knowledge of the evidence adduced at the trial leading to the ... convictions." *Silbert v. State,* 10 Md.App. 56, 65, 267 A.2d 770 (1970). Appellee's evidence is insufficient to establish that Mr. Clark made a habit of assaulting others or that he had a "propensity" to do so. Whether what occurred on March 13 and 14 is characterized as two separate events or one continuous episode, the mere fact that Mr. Clark had previously been suspended for fighting at locations other than a dormitory did not establish the foreseeability that he would assault his roommate.

### The Moral Blame Attached to the Defendant's Conduct

In an article entitled *Rescinding Offers of Admissions when Prior Criminality is Revealed,* 105 Ed. Law Rep. 855 (1996), Jerome Stokes and Allen Groves present the following questions:

Does the primary goal of the juvenile and criminal justice system—rehabilitation and redemption—warrant a "clean slate" free from references to past mistakes? Or does each member of the university community have a right to know these facts and make its own individual decision whether to forgive and forget the past?

*Id.* at 872–73. The authors point out that "often lost in the debate of redemption versus recidivism is another, perhaps, greater risk to society if there is to be no opportunity for a college education and a truly fresh start in life." *Id.* at 873. Allowing Mr. Clark to resume his studies in the fall of 1998 was consonant with both good morals and good public policy.

### The Extent of the Burden to the Defendant

According to appellee, because appellant's duty to protect tenants and/or invitees from Mr. Clark did not extend to any

UMES student other than the student assigned to the same dormitory room, all appellant had to do was require that Mr. Clark reside "off campus" or in a one person dormitory room. As discussed above, however, Mr. Clark had been suspended for fighting at an off-campus party and at an outdoor location on campus. Under these circumstances, if appellant had a duty to protect appellee from Mr. Clark, appellant owed such a duty to every other UMES student.

In *Crow v. State of California*, 222 Cal.App.3d 192, 271 Cal.Rptr. 349 (1990), the California Court of Appeal, Third District, held that a state university was not liable to a plaintiff who had been assaulted in a dormitory by a fellow student during a "keg party," even though there was evidence that the university was aware of the violent propensities of the student who committed the assault. The appellate court expressly agreed "with the assessment of [the university] that it could 'not have prevented this [violent] incident from taking place except *possibly* by posting guards in each dorm room on a 24–hour, 365–day per year basis.' " *Id.* at 360. In the case at bar, assuming the foreseeability that Mr. Clark would assault a fellow student, appellant would have been required to (1) prohibit Mr. Clark from returning to the school, or (2) monitor his activities on a 24–hour basis. Appellee concedes that appellant was not obligated to prohibit Mr. Clark from returning to the campus. This Court declines to hold that appellant should have been required to monitor all of Mr. Clark's activities.

## Conclusion

Appellant owes to each and every UMES student the same duty of care it owes to all of its other business invitees. Appellant owes to all of its dormitory students the same duty of care that a landlord owes to its tenants. Under appellee's theory of the case,[6] although it was not unreasonable for

---

6. Our focus on appellee's "theory of the case" is essential to resolve the issues presented, and should not be misinterpreted as a criticism of the

appellant to allow Mr. Clark to "come to classes, [go] to the library, [and] attend lectures," appellant nonetheless breached its duty of care to appellee by assigning appellee and Mr. Clark to the same dormitory room. We are persuaded, however, that the evidence of Mr. Clark's prior misconduct was insufficient to establish the foreseeability that he would assault the other person assigned to his dormitory room. We therefore hold that appellant did not breach its duty of care to appellee—or to any other UMES student—by failing to require that Mr. Clark reside by himself or off campus.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR ENTRY OF JUDGMENT IN FAVOR OF APPELLANT; APPELLEE TO PAY THE COSTS.**

SONNER, J., dissents and files a separate opinion.

SONNER, Judge, dissenting.

I respectfully dissent. In reaching its decision to reverse Rhaney's award, the majority sets out a plausible interpretation of the evidence presented as trial. I would take no issue with its conclusion if it was the jury assigned to this case below. Of course, though, it is not a jury, but an appellate court that may not usurp the jury function. Instead, in my opinion, the award should be upheld because the University owed a duty of reasonable care towards Rhaney under the very specific circumstances of this case and the jury was entitled to find a breach of that duty, based upon the evidence presented at trial.

The underlying legal question in this appeal is whether the University owed Rhaney a duty to prevent Clark's assault. Ordinarily, a person has no duty to protect another from criminal acts by a third person. *Scott v. Watson,* 278 Md. 160, 166, 359 A.2d 548 (1976). If, however, a "special relationship" exists between the actor and the third person, or between the

strategy employed on appellee's behalf by the able, ethical advocate who has represented appellee throughout these proceedings.

actor and the injured person, a duty may be imposed. *See* Restatement (Second) of Torts § 315 (1965). In its jury instructions, the court identified four different "special relationships" that might allow for the University's liability: business to invitee; landlord to tenant; university to student-victim; and university to student-aggressor. Rhaney needed only one basis to get his case to the jury. I find the first basis, business to invitee, applicable and dispositive of the appeal.

A business owes its invitee "a duty to use reasonable and ordinary care to keep the premises safe and to protect the invitee from injury caused by an unreasonable risk, which the invitee, by exercising ordinary care for his own safety, will not discover." *Southland Corp. v. Griffith,* 332 Md. 704, 715–16, 633 A.2d 84 (1993) (citation omitted).

"The burden is upon the customer to show that the proprietor . . . had actual or constructive knowledge" that the dangerous condition existed. When another patron creates the danger, the proprietor may be liable if it has actual notice and sufficient opportunity to either correct the problem or warn its other customers about it.

*Rehn v. Westfield America,* 153 Md.App. 586, 598, 837 A.2d 981 (2003). In other words, a business's duty of care includes a responsibility to protect its invitees "against dangers which may be caused by negligent acts of . . . employees, or even of customers," if those acts were foreseeable. *Giant Food, Inc. v. Mitchell,* 334 Md. 633, 636–37, 640 A.2d 1134 (1994) (quotation omitted).

It is clear to me that the University, in the business of education, owed Rhaney, a customer of its services, a duty of ordinary care. That duty included a protection against the particular violent act that Clark perpetrated against Rhaney because the University had actual knowledge of Clark's propensity to fight with students, and it had the opportunity to correct for this problem by, among other things, expelling Clark all together, suspending him temporarily and readmitting him upon actual or reasonable evidence of rehabilitation,

and/or allowing him to re-matriculate, but barring him from living in the dormitories, where, without a doubt, he would be forced to interact with other students.

In suspending Clark, then readmitting him, then allowing him to live in the dormitories, and then allowing him even to share a double occupancy room, the University made business decisions that affected its other students. The University took a special interest in Clark—his earlier aggression forced it to do so—and once it did, the University alone knew the true risk of exposing Clark to other students, especially in the close, personal space of living quarters. Given Clark's earlier conduct, it should not be said that his violent and exaggerated response to the damaged fish tank was unforeseeable.

This would be a different case if the University did not know of Clark's past troubles relating to students, or if the University had readmitted Clark, but not allowed him to live in the dormitory and the fight happened in a lecture hall, rather than a bedroom. Indeed, it would be careless to read this dissent as an invitation to impose liability on every college that admits any student who has ever been disciplined for violent behavior. The legal concept of duty is more complicated than that, depending, as it does, upon each particular set of facts. There are principles and guideposts for determining duty, not simple formulas. I would hold that a duty existed here.

I would also respect the jury's prerogative to find a breach of that duty and award Rhaney compensation. In *Fowler v. Smith*, 240 Md. 240, 246–47, 213 A.2d 549 (1965), Chief Judge Prescott explained the breach factor of Maryland's tort law in one important and often-quoted paragraph:

Negligence is a relative term and must be decided upon the facts of each particular case. Ordinarily it is a question of fact to be determined by the jury, and before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tend-

ing to establish negligence drawn. And Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury. The rule has been stated as requiring submission if there be any evidence, however slight, *legally sufficient* as tending to prove negligence, and the weight and value of such evidence will be left to the jury. However, the rule as above stated does not mean, as is illustrated by the adjudicated cases, that all cases where questions of alleged negligence are involved must be submitted to a jury. The words "legally sufficient" have significance. They mean that a party who has the burden of proving another party guilty of negligence, cannot sustain this burden by offering a mere scintilla of evidence, amounting to no more than surmise, possibility, or conjecture that such other party has been guilty of negligence, but such evidence must be of legal probative force and evidential value. The rule, stated in slightly different terms, is that where the facts are undisputed, or the facts most favorable to the party carrying the burden of establishing another party's negligence are assumed to be true and all favorable inferences, fairly deducible therefrom, are drawn in favor of the burden-carrying party, and such undisputed facts (or the said favorable facts and inferences) lead to conclusions from which reasonable minds could not differ, then the question of negligence, *vel non,* becomes a question of law.

(citations omitted). This expression of deference to the jury function—indeed, in such a way as to set Maryland apart from other states—should allow for Rhaney's recovery in this case.

The Rhaney jury saw Clark, a huge man who weighed 240 pounds. He attended and testified at the trial, even though the case against him had been decided by default. From the evidence it heard and saw, the jury could have discerned that after the University learned of Clark's aggressive actions toward other students, it readmitted him after insufficiently correcting his behavior so as to protect others. The only requirement Clark had to fulfill to regain admission was to select and attend a so-called "anger management" course, one

that the jury could evaluate and that Rhaney argued was utterly bogus. The University did not select it, Clark did, but nevertheless the University approved it, even though it was designed primarily to teach juveniles on probation in Washington, D.C. respect for the law. With nothing more—no counseling, no probationary supervision—the University exposed an unwitting incoming freshman to Clark's aggression.

I would hold on these facts and inferences that it was proper for the jury to decide whether the University's meager response discharged its duty to protect Rhaney from a foreseeable danger. The jury here must have found the University's response insufficient and so returned a verdict in Rhaney's favor. I would respect and uphold the jury's decision.