880 A.2d 357

**Anthony F. RHANEY, Jr.**

v.

**UNIVERSITY OF MARYLAND EASTERN SHORE.**

**No. 118, Sept. Term, 2004.**

Court of Appeals of Maryland.

Aug. 15, 2005.

Ernest I. Cornbrooks, III (Webb, Burnett, Jackson, Cornbrooks, Wilber, Vorhis, Douse & Mason, LLP, Salisbury, on brief), for petitioner/cross-respondent.

Jessica V. Carter, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent/cross-petitioner.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

A damaged fishtank, a sucker punch from its owner, and the resultant broken jaw prompted this litigation initiated by

Anthony F. Rhaney, Jr., a student at the time at the University of Maryland Eastern Shore ("UMES" or "University"). On 29 October 1998, Ennis Clark, another student enrolled at UMES, began moving his personal items from the randomly-assigned dormitory room that he shared with Rhaney into a different dormitory room. When Clark left the room, Rhaney moved Clark's fish tank (which yet awaited transport to the new dormitory room) and noticed it began leaking. Clark returned as Rhaney was attempting to stop the leak. He demanded that Rhaney explain what happened to the fish tank. Clark punched Rhaney in the jaw after Rhaney denied repeatedly that he had cracked the fish tank as he moved it.

Clark had been disciplined once by UMES for fighting before the 29 October 1998 incident with Rhaney. He was involved in two altercations with other students, first at an on-campus party on 13 March 1998 and at a subsequent, related, fight at a campus dining hall on 14 March 1998.[1] UMES suspended Clark after he pled guilty before the Judicial Council of UMES to fighting and disorderly conduct regarding the 14 March incident. The University instructed Clark that the suspension could be lifted if he participated in "professional counseling related to conflict resolutions." Thereafter, Clark attended a Save Our Streets ("S.O.S.") program in Washington, D.C. and offered that experience in satisfaction of the school's requirement for his re-admission. UMES, for better or worse, permitted Clark to return after receiving documentation of his participation in that program.

After the 29 October 1998 battery, Rhaney filed a complaint in the Circuit Court for Somerset County, alleging, among other things, two counts against UMES.[2] Count III pled that UMES either negligently failed to disclose to Rhaney Clark's

---

1. The record does not reflect that Rhaney was involved in the 13–14 March incidents.

2. The complaint also pled two counts of intentional torts (Counts I and II, assault and battery, respectively) against Clark. A default judgment was entered against Clark on 7 February 2002. Clark is not a party to this appeal.

dangerous tendencies or negligently assigned Clark to be Rhaney's roommate. Count IV stated that UMES breached its duty to Rhaney under premises liability principles, alleging that Rhaney was a business invitee. UMES moved for summary judgment, arguing that UMES, as a landlord, did not violate a known duty to Rhaney as a business invitee or tenant and asserting that a special relationship (a pre-requisite to UMES owing a duty to control the conduct of a third party (Clark)) did not exist between UMES and Rhaney. The judge denied the motion. At the end of a trial, the jury returned a verdict against UMES.

UMES appealed to the Court of Special Appeals. *Univ. of Md. E. Shore v. Rhaney*, 159 Md.App. 44, 858 A.2d 497 (2004) (*en banc*) (hereinafter *"UMES "*). The Court of Special Appeals's majority reversed the judgment of the Circuit Court, observing that there could be no breach of duty owed to Rhaney as a business invitee or tenant where the "evidence of Mr. Clark's prior misconduct was insufficient to establish the foreseeability that he would assault the other person assigned to his dormitory room." *UMES*, 159 Md.App. at 60, 858 A.2d at 506. The intermediate appellate court refused to address the special relationship theory interjected by UMES because it had not been alleged by Rhaney in his complaint as a theory of recovery. *Id.* at 47–48 n. 2, 858 A.2d at 499 n. 2 (citing *Bourexis v. Carroll County Narcotics Task Force*, 96 Md.App. 459, 473, 625 A.2d 391, 398 (1993)).

We granted Rhaney's petition and issued a writ of certiorari, *Rhaney v. University of Maryland Eastern Shore*, 384 Md. 448, 863 A.2d 997 (2004), to consider the following questions:

I. Did the Court of Special Appeals err by imposing an incorrect standard of foreseeability of harm which unduly restricts causes of action against business hosts and landlords for their failure to protect invitees or tenants from criminal activity?

II. Did the Court of Special Appeals improperly inject into the case law of premises liability applicable to this case

its views of proper public policy regarding proper college admission, re-admission, and disciplinary procedures?

We also granted the conditional cross-petition of UMES possibly to consider the following:

III. Did the University owe a duty to protect Rhaney from the student who punched him when the University had not taken charge or custody of either student and when the University undertook no affirmative act to protect Rhaney upon which Rhaney could reasonably rely?

We are persuaded to affirm the Court of Special Appeals's judgment, but upon different grounds. Because Rhaney shall not prevail as to any of his questions properly raised in his petition for writ of certiorari, the question presented in UMES's cross-petition shall not be reached or decided.

I.

A.

Clark matriculated initially at UMES in the fall of 1997 as a first semester freshman. After completing his first semester, he was involved in an on-campus altercation at the Student Development Center on the night of 13 March 1998. The fight re-erupted on the fourteenth of March in front of a campus dining hall. Clark and several others were detained by campus police; Clark and one other student were suspended as a result. The remaining students involved in the fracas received on-campus punishment.

Clark's suspension was not necessarily infinite. UMES prescribed in a letter, dated 24 March 1998, that Clark could apply for readmission for the fall 1998 semester if he completed "professional counseling sessions related to conflict resolutions." If he did so, Clark could be re-admitted under a one academic year probationary period—subject to immediate and indefinite suspension for any future disciplinary violations. According to a letter, dated 11 June 1998, from the UMES Vice President for Student Affairs, Clark's participation in the

S.O.S. program [3] satisfied the counseling requirement attached to the March 1998 suspension, although the "one academic year" probationary period would remain in effect should Clark apply for re-admission. Clark applied for re-admission the same day; he was re-admitted on 29 June 1998.

After being randomly assigned as roommates, Clark and Rhaney co-existed peacefully until the October 1998 fishtank incident.[4] UMES did not inform Rhaney of Clark's prior disciplinary decision, although Rhaney testified that he knew of the March 1998 incident within a few weeks of the start of the fall semester.[5]

On 29 October 1998, while Clark moved his personal belongings from the room he shared with Rhaney to another dormitory room, Rhaney and a friend began to rearrange the remaining furniture in the room. They moved Clark's fish tank from the top of a desk. The tank cracked and began leaking. As Rhaney attempted to stop the leak and clean-up the spilled water, Clark returned to the room. A heated argument arose. Rhaney denied continuously that he had broken the fishtank. During a pause in the purely vocal altercation to that point, Clark punched Rhaney in the jaw.

---

3. An associate director of S.O.S., in her letter to UMES, dated 1 June 1998, stated that Clark had "successfully participated" in a S.O.S. "program." Referencing a program description included with the letter, the associate director stated that some of the goals of the S.O.S. program included teaching court-referred Washington, D.C., youths (who had been charged with weapons offenses) how to "resolve conflict verbally, without resorting to violence, to develop more favorable attitudes toward law-abiding behavior, and to make positive choices in response to conflict."

4. Clark's move to a new dormitory room on 29 October 1998 was to be with old friends.

5. The parties agree that UMES could not disclose Clark's prior disciplinary record to Rhaney, even had Rhaney made a specific request for disclosure. 20 U.S.C.S § 1232g (b)(1)(I) (1998) (prohibiting the disclosure of disciplinary records at the risk of losing federal funds except in "connection with an emergency ... if the knowledge of such information is necessary to protect the health or safety of the student or other persons."). Section 1232g (b)(1)(I) was amended to permit the disclosure of disciplinary proceedings that occurred after 7 October 1998.

In the resultant surgery, Rhaney's mouth was wired shut. He incurred significant medical expenses.[6] Rhaney eventually completed his first semester at UMES, but withdrew before receiving his degree. Clark withdrew from UMES after his battery of Rhaney.

## B.

Rhaney's complaint alleged against UMES essentially the following theories of recovery in negligence:

29. [UMES] was negligent in that it failed to disclose to [Rhaney] that his roommate, [Clark], had dangerous and violent propensities, which were known to [UMES] or its agents, servants, and employees. The likelihood of an assault by Clark on [Rhaney], or others, was foreseeable.

30. [UMES] was further negligent in that it assigned [Clark] to be a roommate of [Rhaney], under circumstances when it knew or should have known that [Clark] had dangerous propensities including a history of assault.

31. [UMES] breached its duty of reasonable care by permitting [Clark] to be in proximity to [Rhaney], and as a result of the negligence of [UMES], [Rhaney] was injured and sustained damages.

\* \* \*

35. [UMES] is an institution of higher learning maintaining a campus at Princess Anne, Somerset County, Maryland, for the purpose of educating and housing students, among its other functions.

36. [Rhaney] was properly enrolled as a full-time student and residing in a dormitory provided by [UMES].

37. While lawfully on the portion of the premises to which he was invited and expected to be by [UMES], [Rhaney] was assaulted and battered by [Clark] as set forth above.

---

**6.** The jury awarded $74,385.00 in compensatory damages to Rhaney.

38. [Rhaney] was an invitee of [UMES's] property, and [UMES] breached its duty of reasonable and ordinary care to maintain the premises safely for [Rhaney], and to protect [Rhaney] against injury caused by unreasonable risk which [Rhaney], exercising due care, could not discover.

39. [UMES] breached its duty of care by permitting [Clark] to be in proximity with [Rhaney]; by failing to protect [Rhaney] from [Clark's] dangerous propensity; and by failing to warn [Rhaney] of Clark's dangerous propensities.

In UMES's memorandum supporting its motion for summary judgment, it argued that "there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists between the actor and the third person or between the actor and the person injured." *Ashburn v. Anne Arundel County*, 306 Md. 617, 628, 510 A.2d 1078, 1083 (1986) (citations omitted). It explained that the university/student relationship by itself did not constitute a special relationship at law. UMES further contended that, for purposes of the motion, neither a business owner/invitee nor a landlord/tenant status (assuming one or the other existed between UMES and Rhaney) created a legally cognizable duty in this case. Even if a duty were recognized, UMES alternatively asserted that that duty was one of reasonable care and was not breached by UMES based on the undisputed material facts of this case. As noted earlier, the trial court denied UMES's motion.

At trial at the close of Rhaney's case-in-chief and again at the close of all of the evidence, UMES moved for judgment, repeating its summary judgment arguments. Rhaney's counsel retorted only that UMES owed a legal duty to Rhaney as a landlord would a tenant or a business owner to a business invitee. The trial court denied UMES's motions and submitted the case to the jury.

The jury was instructed on the duty of a landlord to a tenant, a business owner to an invitee, and the duty arising in a special relationship, if one is found to exist, to control a third

person's conduct. Rhaney's counsel objected to the special relationship jury instruction, which had been proposed by UMES, but did not offer one of his own regarding a special relationship theory of recovery.

Following jury instructions, Rhaney's counsel argued in closing that a duty existed between UMES and Rhaney as a business owner to an invitee or as a landlord to a tenant and that UMES breached that duty. UMES's counsel argued once again that UMES owed no duty to Rhaney for Clark's intentional torts, absent a special relationship, which did not exist. In rebuttal, Rhaney's counsel explained that UMES owed a duty both to control Clark and protect Rhaney (and all other UMES students) through administration of its judicial discipline system. The jury ultimately found that UMES breached a duty of reasonable care owed to Rhaney and that the breach was the proximate cause of Rhaney's injuries.

On UMES's appeal, the intermediate appellate court held that there was insufficient evidence to establish that Clark's battery of Rhaney in the dormitory room was foreseeable by UMES and overturned the judgment in favor of Rhaney. *UMES*, 159 Md.App. at 60, 858 A.2d at 506. The intermediate appellate court determined that, based on the single prior disciplinary action regarding the March 1998 dining hall fracas, there could be no breach of a legal duty because UMES could not have foreseen that Clark later would attack his roommate. The Court of Special Appeals explained that UMES's duty to Rhaney as Clark's dormitory roommate, under either a business owner/invitee or landlord/tenant relationship theory, was no greater than UMES's duty owed to any UMES student on campus or any dormitory-housed student. *Id.* at 59, 858 A.2d at 506. Rhaney's legal premise, allowing that it was not unreasonable for UMES to permit Clark to re-attend classes and enter other on-campus buildings, but that it was unreasonable to allow Clark to share a dormitory room with Rhaney, was rejected. *Id.* at 60, 858 A.2d at 506. The intermediate appellate court also refused to consider whether a special relationship existed because that theory of recovery was not plead by Rhaney. It also noted

that other jurisdictions considered similar situations under landlord/tenant and/or business owner/invitee models for analysis. *Id.* at 47–48 n. 2, 858 A.2d at 499 n. 2.

## II.

■ Rhaney's main thesis advanced before us is that the Court of Special Appeals applied inappropriately a foreseeability standard to determine whether a breach of a known duty existed here under either a business owner/invitee or landlord/tenant analysis. UMES counters that the known duty of reasonable care, under either theory, does not apply in the first instance because UMES lacked sufficient knowledge to enable it to foresee Clark's battery of Rhaney predicated on the incident that occurred earlier in 1998 in other than a dormitory setting. Furthermore, UMES asserts that a duty did not exist under any legal theory offered by Rhaney.[7]

■ Before examining the contentions, it is appropriate to reiterate briefly the principles applied in Maryland in tort cases regarding whether a duty exists. A cause of action in negligence must demonstrate "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *E.g.,* *Muthukumarana v. Montgomery County,* 370 Md. 447, 486, 805 A.2d 372, 395 (2002). It is the burden of the plaintiff, in

---

7. As a threshold matter, UMES argues that Rhaney briefed questions before us that are not identical to those raised in his successful petition for certiorari. UMES asserts that we should dismiss entirely Rhaney's appeal because it does not comply with Md. Rule 8–504(a)(5) (stating a brief shall include "[a]rgument in support of the party's position."). Ordinarily, we consider only those issues raised in a petition for certiorari (or a cross-petition) that are preserved properly for appellate review. Md. Rule 8–131(b). In what can only be characterized as a close call, we find sufficient substance in Rhaney's brief responding to the issues decided by the Court of Special Appeals. Those aspects of Rhaney's brief pertaining to any question not raised in his petition for writ of certiorari will not be addressed. Md. Rule 8–131(b); *Renbaum v. Custom Holding, Inc.,* 386 Md. 28, 33 n. 2, 871 A.2d 554, 557 n. 2 (2005).

the first instance, to adduce evidence of a duty that was breached and proximately caused the injuries sustained.

■■ In this regard, we embrace Judge Cardozo's iteration of the social policy to narrow "the concept of duty to embrace only those persons or classes of persons to whom harm of some type might reasonably have been foreseen as a result of the particular tortious conduct." *Henley v. Prince George's County,* 305 Md. 320, 333–34, 503 A.2d 1333, 1340 (1986) (citing *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928)); *see Doe v. Pharmacia & Upjohn Co.,* 388 Md. 407, 879 A.2d 1088 (2005). Absent a duty owed to the plaintiff, as established by the plaintiff, there can be no liability in negligence and the defendant is entitled to judgment as a matter of law. *Remsburg v. Montgomery,* 376 Md. 568, 581, 831 A.2d 18, 25 (2003); *Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84, 88 (1993); *West Va. Cent. & Pittsburgh Ry. Co. v. Fuller,* 96 Md. 652, 666, 54 A. 669, 671–72 (1903) ("before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury."). Only after establishing that a duty does indeed exist must we consider *what* that duty is and whether sufficient evidence exists to prove that a defendant, by action or inaction, breached that duty.

■ There is no duty generally to control the conduct of a third person so as to prevent him or her from causing physical harm by criminal acts or intentional torts, absent a special relationship. *Horridge v. St. Mary's County Dept. of Social Svcs.,* 382 Md. 170, 183, 854 A.2d 1232, 1239 (2004); *Lamb v. Hopkins,* 303 Md. 236, 242, 492 A.2d 1297, 1300 (1985) (quoting Restatement Second (Torts) § 315 (1965)). In contrast to, and distinct from, the general rule regarding liability for the acts of third parties, there are distinct affirmative duties [8] associat-

---

**8.** We will use the term special relationship, an exception to the generally accepted rule that a party owes no duty to the victims of intentional

ed with being an owner or occupier of real property. Our review of the relevant case law leads us to conclude that UMES, if a landlord, had no cognizable duty to Rhaney as a tenant on the leased premises under the circumstances of this case and that Rhaney's negligence claims may not be categorized properly as those of a business invitee for a tort occurring within the University's premises on the basis that he, as a student, effectively leased the dorm room as his temporary domicile.

A. Duty of a Landlord to a Tenant in the Leased Premises

A landlord's duty to a tenant within the common areas generally is one of reasonable care to protect against known, or reasonably foreseeable, risks. *Scott v. Watson,* 278 Md. 160, 169, 359 A.2d 548, 554 (1976). In *Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship,* 375 Md. 522, 537, 826 A.2d 443, 452 (2003), we articulated the general principle that a landlord "has no obligation to maintain the leased premises for the safety of the tenant." In certain circumstances, a duty to a tenant in the leased premises may arise out of dangerous and defective conditions within the common areas controlled by the landlord, but only in a narrow context—the landlord must have actual knowledge of activity taking place in the common areas that may affect the demised premises or, in the alternative, the landlord should have had such knowledge and foreseen the harm suffered. *Id.* at 546, 826 A.2d at 457; *Shields v. Wagman,* 350 Md. 666, 681, 714 A.2d 881, 888 (1998) (assessing liability of landlord based on the knowledge or foreseeability of injury); *see Henley,* 305 Md. at 334, 503 A.2d at 1340 (observing that foreseeability generally limits a duty to only " 'identifiable plaintiffs,' *i.e.,* those within a foreseeable zone of danger whose identities are known in advance"). Mindful of the need to avoid making a landlord the insurer of its tenant's safety, *Scott,* 278 Md. at 169, 359 A.2d at 554, and

torts of third-party tortfeasors, separate from the distinct affirmative duties arising out of the legal relationship of the property owner and the victim.

in conjunction with the direction to construe questions of duty so as to avoid unlimited or overly broad liability, *Henley,* 305 Md. at 333–34, 503 A.2d at 1340, the analysis of whether the assumed landlord owes a duty in the present case rests on the threshold determinations of whether Clark constituted a "dangerous condition" and whether the harm to Rhaney was a result of UMES's actual knowledge of Clark's propensity to assault and batter his future roommate or, in the alternative, if UMES should have foreseen the harm suffered by Rhaney based on the knowledge of Clark's relevant past activities.

We cannot agree with Rhaney that Clark's alleged propensity to batter his roommate may be characterized properly as a dangerous or defective condition within the meaning of *Hemmings.* In *Hemmings,* the dangerous condition within the common areas, giving rise to a duty, was a physical one—the duty to maintain lighting deemed, in that case, essential for security of the apartment building. 375 Md. at 548, 826 A.2d at 458. The apartment building owner had installed exterior lighting in common areas outside the building that ceased to function at some point. An unidentified intruder entered forcibly into the Hemmings' apartment, destroying the aluminum-framed, sliding glass door that separated the Hemmings' apartment from the exterior balcony. The owner-supplied "Charlie Bar," a horizontally mounted security bar that physically prevents the sliding glass door from opening fully or at all, was absent when a contractor arrived to repair the door nine days after the forced entry. *Id.* at 529, 826 A.2d at 447.

The majority's analysis in *Hemmings* was based partly on *Scott v. Watson,* an opinion replying to certified questions from the United States District Court for the District of Maryland. In *Scott,* we held that a landlord had a duty of reasonable care to its tenants where the landlord had knowledge of criminal activities occurring within the common areas of the premises. 278 Md. at 169, 359 A.2d at 554. We did not state, nor imply, however, that such criminal acts occurring in the common areas themselves constituted a "dangerous or defective condition." We did not make the landlord an insurer of its tenants against these criminal acts; rather, a landlord

has a duty to "take *reasonable* measures, in view of the existing circumstances, to eliminate those *conditions* contributing to the criminal activity." *Id.* at 169, 359 A.2d at 554 (second emphasis added). The conditions in *Scott* and *Hemmings*, not present here, were physical ones that contributed to or facilitated the commission of tortious acts—not the tortious acts themselves or the tortfeasors. Such a conclusion is consistent with the general rule that there is no duty to control the tortious acts of a third person.[9]

Even if Clark fairly could be characterized as a "dangerous condition," UMES argues persuasively that it neither had knowledge nor could have foreseen that Clark would batter his roommate in their shared dormitory room. UMES possessed records of only one disciplinary action against Clark, an inadequate basis from which to make the harm to Rhaney foreseeable.[10] Clark's disciplinary action was a result of an ongoing altercation between students at a social event on campus that continued into the dining hall the next day. There is nothing otherwise in the record to suggest that Clark had a propensity for violence nor that UMES had knowledge, or reason to believe, that Clark was more than a one-time,

---

9. Taken to the extreme, were we to conclude that Clark personally amounted to a "dangerous condition," UMES could owe a duty to every occupant of each dormitory as Clark might move from room to room. Under this extreme scenario, a floating duty, anchored only by Clark's presence, would follow him as he moved into an area where a potential plaintiff could demonstrate UMES controlled the premises.

10. One could argue theoretically that some type of harm inevitably would fall upon any future roommate that could raise Clark's ire sufficiently for Clark to batter him or her. Our view of foreseeability is not nearly wide enough to include a *possible* result, but deals more with the *probability* of that result. Without more than the one incident in this record, which involved multiple people in a social setting (student dining hall and social hall) incongruous with our facts (one person, roommate), the probability of Clark assaulting his prospective roommate at the time UMES assigned Rhaney and Clark as roommates was not high. *See Brown v. Dermer*, 357 Md. 344, 358, 744 A.2d 47, 55 (2000) (quoting *Henley*, 305 Md. at 336, 503 A.2d at 1341 (observing that foreseeability " 'involves a prospective consideration of the facts existing at the time of negligent conduct' ")).

youthful offender of the student disciplinary system.[11]

In comparison, the strongest factor bearing on the role of foreseeability and the imposition of a duty in *Scott* and *Hemmings* was the police records of multiple crimes in the geographic vicinity. *Scott* noted 56 crimes against property and 16 crimes against persons on or near the apartment premises. 278 Md. at 163–64, 359 A.2d at 551. We also noted that the defendant had no knowledge of any crimes resulting in physical harm against persons in the months preceding the fatal assault in its underground parking garage. *Id.* at 164, 359 A.2d at 551. The record in *Hemmings* identified complaints from tenants about violent crimes at the apartment complex, including burglaries where intruders entered apartments after forcing their way through a rear patio door or sliding glass door. 375 Md. at 531, 826 A.2d at 448. Even in *Matthews v. Amberwood Assocs. Ltd. P'ship*, 351 Md. 544, 549–50, 719 A.2d 119, 121 (1998), a case where a landlord was held liable for a fatal attack on a small child by a Staffordshire Bull Terrier in an apartment (regulated by a lease with a "no dogs" provision), evidence was presented to the jury that numerous people had warned the landlord that the dog exhibited aggressive behavior towards humans on multiple occasions.

## B. No Duty Under Business Owner/Invitee Standard

A business owner has an affirmative duty to its invitees—"a duty to use reasonable and ordinary care to keep the premises safe and to protect the invitee from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for his own safety, will not discover." *Southland Corp. v. Griffith*, 332 Md. 704, 715–16, 633 A.2d 84, 89 (1993) (citing *Sherman v. Suburban Trust Co.*, 282 Md. 238,

11. During the March 1998 proceedings before the Judicial Council, Clark stated that the 14 March 1998 fight was a continuation of an altercation from a party on 13 March 1998. The Judicial Council reported that Clark claimed that he was confronted by eight individuals and had gotten involved in an attempt to "break-up the fight." That report also stated that one student had been advised to seek medical treatment for scratches and bruises received from the altercation.

242, 384 A.2d 76, 79 (1978)). Liability for breach of this affirmative duty may arise from a defective or unsafe condition or from dangers associated with employees or other invitees when that business owner, "as a reasonably prudent person ... should have anticipated the possible occurrence and the probable results of such acts." *Eyerly v. Baker*, 168 Md. 599, 607, 178 A. 691, 694 (1935).

We consider first whether Rhaney was a business invitee of UMES at the time of the attack. Beyond his matriculation generally as a student at UMES, Rhaney's specific contractual relationship with UMES as to his occupancy of the dormitory room was governed by a distinct "Residence Hall Agreement." Rhaney, while inside the dormitory building, was a tenant of a landlord, but not necessarily a business invitee. Business invitees are visitors invited to enter the premises in connection with some business dealings with the possessor. *Burkert v. Smith*, 201 Md. 452, 456, 94 A.2d 460, 461 (1953); Restatement (Second) Torts § 332 (1965); Dan B. Dobbs, *The Law of Torts*, § 234 at 599–602 (2000). Maryland tort law embraces the analytical premise that a person's status on the land at the time of the incident generally controls his or her legal status and the landowner's attendant duty. *Crown Cork & Seal Co. v. Kane*, 213 Md. 152, 156–59, 131 A.2d 470, 472–75 (1957); *Gordon Sleeprite Corp. v. Waters*, 165 Md. 354, 356–60, 168 A. 846, 847–48 (1933); Restatement (Second) Torts § 332, cmt. l. Rhaney may have been a business invitee as a student on the UMES campus generally in its common areas, dining halls, and academic buildings, but, upon entering his dormitory building his legal status vis à vis UMES was regulated more specifically by the Residence Hall Agreement, and thus he was a tenant of UMES at the time of the battery by Clark.[12]

---

12. UMES and Rhaney analyze and argue the duty question under both business owner/invitee and landlord/tenant relationships using decisions from other jurisdictions. Our review of those cases confirms our belief that Rhaney's status was, at best, that of a tenant, not a business invitee. Other states' cases cited by the parties are inapposite because the incidents occurred either outside a dormitory or in jurisdictions no

Even were Rhaney's relationship with UMES at the time of the attack analyzed as one of business invitee/business owner, he would not prevail.  There was insufficient evidence of a breach of the duty of reasonable and ordinary care to keep the premises safe or to protect Rhaney from injury caused by an unreasonable risk which Rhaney, through the exercise of ordinary care for his own safety, could not discover.  As noted previously, Rhaney knew, within a few weeks of the start of the Fall 1998 semester, of Clark's involvement in the March 1998 incident.  That apparently did not give him sufficient pause to request assignment to a new room or roommate.  Essentially then, Rhaney knew what UMES knew about any "propensity" on Clark's part and apparently saw no reason to act to protect himself against any foreseeable danger.  UMES did not act unreasonably in readmitting Clark, where it established a prerequisite for education in conflict resolution, which Clark produced evidence of satisfying.  There being no pattern of sufficient prior violence on Clark's part in circumstances similar to what ultimately happened to Rhaney, UMES could not be said to be responsible for reasonably foreseeing what happened and, therefore, to have a duty to forestall its occurrence or stand liable for the consequences.

### III.

Because Rhaney shall not prevail on the issues properly raised in his petition for writ of certiorari that were briefed

---

longer adhering to the premise that legal status of victims on the pertinent property determines premises liability questions.  *E.g., Johnson v. State,* 77 Wash.App. 934, 894 P.2d 1366, 1370 (1995) (incident occurred outside dormitory classified as invitee);  *Nero v. Kansas State Univ.,* 253 Kan. 567, 861 P.2d 768, 779 (1993) (issue before the court on appeal from summary judgment classified properly as a landlord/tenant relationship when criminal act occurred in dormitory common area);  *Mullins v. Pine Manor College,* 389 Mass. 47, 449 N.E.2d 331, 337 (1983) (disregarding cases from jurisdictions relying on status of landowner to victim and relying on special relationship to form a special duty).  We disagree with those jurisdictions that hold the proper analysis is that of a business invitee when the incident occurs within a dormitory.  *Williams v. Louisiana,* 786 So.2d 927, 932 (La.Ct.App. 2001).

and argued before us, we need not, and shall not, reach or decide the issue raised in UMES's conditional cross-petition.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.*