# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 7, 2007       Decided October 30, 2007

No. 05-7188

BRUCE FEIRSON AND
MARY FEIRSON,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00905)

*Fred T. Magaziner*, pro hac vice, argued the cause for appellants. On the briefs were *Frank J. Eisenhart*, *Barrie A. Dnistrian*, and *Christian A. Natiello*.

*David A. Hyden*, Assistant Attorney General, Office of Attorney General for the District of Columbia, argued the cause for appellee District of Columbia. With him on the brief were *Linda J. Singer*, Attorney General, *Todd S. Kim*, Solicitor General, and *Edward E. Schwab*, Deputy Solicitor General.

*Thomas M. Hogan* argued the cause and filed the brief for appellee Michelle Smith-Jefferies, M.D., Taunya Brownlee, M.D., and Craig Thorne, M.D.

Before: RANDOLPH and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Concurring opinion filed by *Senior Circuit Judge* WILLIAMS.

BROWN, *Circuit Judge*: Bruce Feirson, now a retired Metropolitan Police Department (MPD) officer, sustained serious neck and lower back injuries during an "attack exercise"—part of a MPD training program. Feirson and his wife, Mary, sued the District of Columbia and three physicians who worked at the District's Police and Fire Clinic. Feirson asserted claims under 42 U.S.C. § 1983 and District of Columbia law. Mary sought compensation for loss of consortium. In separate orders, the district court granted summary judgment for the District and the three physicians on all of the Feirsons' claims. The Feirsons now appeal. We affirm the district court's various grants of summary judgment.

I

Viewed in the light most favorable to Feirson, the facts are as follows. Feirson had a history of back problems dating back to 1979. His problems first became serious in 1985 when he twisted his lower back while chasing a suspect. Feirson underwent spinal surgery and returned to full duty several months later. The following year he felt a snap in his back while entering his car, and he again underwent spinal surgery. From mid-1986 to mid-1988 it was medically uncertain whether

Feirson could function as a police officer. But in June 1988, Feirson returned to full duty when the District's Board of Police and Fire Surgeons determined he could perform without restrictions.

In 1999, the MPD required its officers to be certified to use a new retractable baton made by Armament Systems & Procedures, Inc. The baton, which MPD officers referred to as the "ASP," replaced the traditional "nightstick." The MPD included ASP certification training in its regular annual in-service training program.

ASP training had three parts: two to three hours of classroom instruction; two to three hours of physical conditioning exercises, including drills on various strikes and deflection moves; and a 90- to 120-second "attack exercise." To successfully complete the attack exercise, the trainee had to use a foam-covered version of the ASP to fend off an instructor pretending to be a violent suspect. The trainee wore protective headgear and a mouthpiece while his "attacker" wore a padded "hit suit" to absorb the blows the trainee delivered with the ASP. The attacker's hands and feet were also padded. The exercise took place on mats and within a ring formed by other trainees who carried padded shields. The exercise was designed to simulate a "code orange" situation—one level below a situation in which an officer would be authorized to use deadly force. The attacker charged toward the trainee aggressively, using pulled punches and kicks, and grabbing, wrestling, or throwing the trainee.

In April 2000, Feirson's supervisor ordered him to attend annual in-service training. Concerned about his back after hearing rumors that officers were being "beaten and assaulted" during ASP training, Feirson asked his supervisor if he could reschedule or avoid going altogether. Feirson's supervisor, apparently unmoved by his concerns, handed him a written order

to attend. After all, annual in-service training was required for MPD officers, and Feirson had been deemed fit for full duty after undergoing a medical examination two months earlier.

Feirson participated in ASP training on April 27, 2000. Already winded from the preceding exercises, he tried to fake his way through the attack exercise portion. First he tried to clutch his attacker until the time ran out. By closing the distance, Feirson thought he could muffle the attacker's punches and kicks. The instructor timing the exercise foiled this plan, however, when he stopped the clock, separated Feirson and his attacker, told Feirson to swing the ASP more, and then restarted the exercise. Next Feirson tried, in his words, to "get back on the rope." He hoped to hide near the edge of the ring, but his comrades shoved him back in when he came too close to their shields. Meanwhile, the attacker pursued him, continuing to throw punches and kicks. During the fray, the attacker struck Feirson in the face, causing his head to jerk backward.

This entire episode lasted over a minute, but less than two. It ended when the attacker, recognizing Feirson "had enough," stopped the exercise. Feirson felt some soreness and numbness, but he did not report his symptoms to the Police and Fire Clinic until the next day. As it turns out, Feirson suffered serious neck and lower back injuries, requiring him to undergo spinal surgery. Feirson became eligible for disability retirement because of his injuries, and he subsequently retired.

Feirson and his wife sued the District and thirteen physicians who staffed the Police and Fire Clinic, including Doctors Michelle Smith-Jefferies, Taunya Brownlee, and Craig Thorne (the "Physician Defendants"). The Physician Defendants worked for PFC Associates, Inc., a private corporation that operates the Police and Fire Clinic under a contract with the District. The Feirsons never served process on the other ten

physicians, whom the Feirsons named "John and Jane Does, nos. 1–10."

The district court granted summary judgment for the District on Feirson's § 1983 claims, concluding that his constitutional rights were not violated. *Feirson v. District of Columbia*, 315 F. Supp. 2d 52 (D.D.C. 2004). Subsequently, the court granted summary judgment for the Physician Defendants. *Feirson v. District of Columbia*, 362 F. Supp. 2d 244 (D.D.C. 2005). The court dismissed Feirson's § 1983 claims, relying on its earlier conclusion that his constitutional rights were not violated. *Id.* at 247. Moreover, finding no evidence of extreme or outrageous conduct, and no duty on the part of the Physician Defendants to protect Feirson, the court dismissed his intentional infliction of emotional distress (IIED) and negligence claims. *Id.* at 247–50. Because the Physician Defendants were not liable to Feirson, the court dismissed Mary's loss of consortium claims. *Id.* at 254.

Finally, the district court granted summary judgment for the District on the Feirsons' remaining claims. *Feirson v. District of Columbia*, No. 01-0905, 2005 WL 3211626 (D.D.C. Nov. 22, 2005). The court concluded that the Police and Firefighters' Retirement and Disability Act (PFRDA), D.C. CODE §§ 5-701 *et seq.* (2001), was Feirson's exclusive remedy against the District.

II

We review a district court's grant of summary judgment de novo. Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute about a material fact is "genuine" only "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

A

To impose liability on the District under 42 U.S.C. § 1983, Feirson must show "not only a violation of his rights under the Constitution or federal law, but also that the [District's] custom or policy caused the violation." *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004). Feirson claims his substantive due process rights were violated when the instructor, acting under MPD orders, attacked him "with a level of force that exceeded any legitimate 'training' objective." He also claims he was twice "seized" in violation of the Fourth Amendment. The first alleged seizure occurred when his supervisor ordered him to attend the annual in-service training; the second occurred during the attack exercise itself.

The district court concluded, and we agree, that Feirson's substantive due process rights were not violated. "[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). Most likely to rise to that level is "conduct intended to injure in some way unjustifiable by any government interest." *Id.* at 849. Although "negligently inflicted harm is categorically beneath the threshold," whether recklessness or gross negligence will suffice "is a matter for closer calls." *Id.*

Feirson cites three assertions that his attacker applied excessive force. The first is his own: "That was the most serious assault I've ever encountered in . . . over 20 years on the police department." The second is from his training expert: "[T]he speed, intensity and level of force . . . was grossly excessive, without justification and outside the scope of reasonable and effective training practices . . . ." The third is from another training expert: "[I]f you go by [Feirson's] description that [it] was a beating of a lifetime . . . then you have misconduct on every officer that was present and all the instructor staff." Moreover, Feirson emphasizes that the MPD's physical skills training was not calibrated to a trainee's age, gender, or experience.

Nonetheless, at most a jury could find the instructors negligent, which is "categorically beneath the threshold of constitutional due process." And even a finding of negligence would be a stretch. The attack exercise followed several hours of classroom and practical instruction on how to use the ASP. Feirson wore protective headgear and a mouthpiece, and the attacker's hands and feet were padded. The exercise was timed and took place on mats. When, after about a minute during which Feirson had maneuvered to escape the blows, it appeared he "had enough," the attacker ended the exercise. Feirson admits he suffered no cuts or bruises, and he had no reason to believe the attacker was trying to hurt him. Although the exercise was not geared to Feirson's fitness level, that was because it was designed to prepare police officers to handle real-life situations.

Our conclusion is bolstered by the exercise's extremely low rate of injury. About three months prior to Feirson's injuries, more than 1300 officers had been trained and only seven reported significant injuries. These "significant" injuries

included a broken foot, a knee injury, a broken finger, two instances of bruised ribs, and two instances of dental trauma.

B

Feirson has also failed to state a Fourth Amendment violation because he was not "seized" within the meaning of that amendment. A seizure occurs "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Here, Feirson asserts that a reasonable person would not have felt free to disobey a direct order to attend annual training when doing so would have jeopardized his career. That may be true, but Feirson has not described a "seizure." The relevant inquiry is whether a reasonable person would have believed he would be detained if he disobeyed his supervisor's order—not whether he feared negative consequences for his job. *See Reyes v. Maschmeier*, 446 F.3d 1199, 1204 (11th Cir. 2006) ("[A] claim that a government supervisor has seized a public employee in violation of the Fourth Amendment must allege circumstances that implicate more than the obligations that arise from the employment relationship."); *Driebel v. City of Milwaukee*, 298 F.3d 622, 642 (7th Cir. 2002) ("Since the Fourth Amendment does not protect against the threat of job loss, the relevant constitutional inquiry must focus on whether reasonable people in the position of the subordinate would have feared *seizure or detention* if they had refused to obey the commands given by their superior officers."); *Fournier v. Reardon*, 160 F.3d 754, 757 (1st Cir. 1998) (negative consequences for employment was "not an issue for [the court] to consider" in determining whether a trainee was seized in violation of the Fourth Amendment).

Taking a different tack, Feirson argues he was "seized" during the attack exercise because he could not stop it. We disagree. Feirson submitted to the exercise, and no evidence would support a finding that the instructors would not have stopped if Feirson asked them to do so. *See Fournier*, 160 F.3d at 757 (a trainee was not seized when "no evidence presented would support a finding that he was not free to leave at any point during the scenario").

C

We agree with the district court that the PFRDA bars Feirson's local law claims against the District. "Police and firefighters in the District who are temporarily injured or permanently disabled while performing their duties are provided compensation under a scheme set forth in the . . . Act." *Ray v. District of Columbia*, 535 A.2d 868, 870 (D.C. 1987). The PFRDA is "the exclusive remedy against the District of Columbia for uniformed personnel." *Lewis v. District of Columbia*, 499 A.2d 911, 915 (D.C. 1985).

Feirson does not deny the injuries he sustained made him eligible for the PFRDA's benefits. However, he reads two cases, *Mayberry v. Dukes*, 742 A.2d 448 (D.C. 1999), and *Grillo v. National Bank of Washington*, 540 A.2d 743 (D.C. 1988), to create an exception "for the intentional tortious conduct committed by a plaintiff's co-employee," within which he contends this case falls.

*Mayberry* addressed whether the PFRDA prevented a police officer from suing a co-employee for injuries sustained in the performance of duty. Because Feirson is suing the District, *Mayberry* is inapplicable. *Grillo* recognized an intentional injury exception to the District's Workers' Compensation Act (WCA), which applies only when the employer *specifically*

intended to injure the employee.  540 A.2d at 747–48, 754.  Even if *Grillo*'s exception applied to the PFRDA, there is no evidence the MPD specifically intended to injure Feirson.

III

Because Feirson's constitutional rights were not violated, his § 1983 claims against the Physician Defendants must fail.  His IIED and negligence claims also fail because they both depend on his mistaken belief that: (1) the Physician Defendants had duties as his doctors to tell the MPD to modify ASP training; and (2) they had contractual duties to report ASP training injuries to the MPD.

Under District of Columbia law, "the question of whether a defendant owes a duty to a plaintiff under a particular set of circumstances is 'entirely a question of law . . . [that] must be determined only by the court.'"  *Croce v. Hall*, 657 A.2d 307, 310 (D.C. 1995) (alterations in the original) (quoting W. PAGE KEETON, PROSSER AND KEETON ON TORTS § 37, at 236 (5th ed. 1984)).  There is "no duty generally to control the conduct of a third person so as to prevent him . . . from causing physical harm by criminal acts or intentional torts, absent a special relation-ship" with the third person or his victim. *Rhaney v. Univ. of Md. E. Shore*, 880 A.2d 357, 364 (Md. 2005);[1] *see also* RESTATE-MENT (SECOND) OF TORTS § 315 (1965).  Relationships in which there is a duty to protect "include landowner-invitee, businessman-patron, employer-employee, school district-pupil,

---

[1] "Our duty . . . is to achieve the same outcome we believe would result if the District of Columbia Court of Appeals considered this case."  *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006).  That court may "take notice of the common law of Maryland in the absence of contrary District of Columbia law." *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 576 n.30 (D.C. 2007).

hospital-patient, and carrier-passenger." *Kline v. 1500 Mass. Ave. Apartment Corp.*, 439 F.2d 477, 482–83 (D.C. Cir. 1970); *see also* RESTATEMENT (SECOND) OF TORTS §§ 314A to 314B.

We reject Feirson's contention that his relationship with the Physician Defendants is a "special" one that imposed a duty on their part to tell the MPD to modify ASP training.[2] A duty to protect arising from a special relationship is based on "the ability of one of the parties to provide for his own protection" being "limited in some way by his submission to the control of the other." *Kline*, 439 F.2d at 483. Here, Feirson fails to explain how the Physician Defendants limited his ability to protect himself by control they had over him, or, for that matter, how they had any control over him. Feirson understood better than anyone the fragility of his back. He was fully aware of the risk posed by the attack exercise, and he took that risk voluntarily. The Physician Defendants were in no better position to protect Feirson than he was to protect himself. *See Workman v. United Methodist Comm. on Relief*, 320 F.3d 259, 264 (D.C. Cir. 2003). Indeed, nothing in the record suggests the Physician Defendants had the power to order the MPD to change its training program, or that a change (whatever it might be) would have prevented Feirson's injuries.

We also reject Feirson's contention that the Physician Defendants had a contractual duty to report injuries to the MPD. The contract between the District and PFC Associates required PFC Associates to implement a "Quality Assurance Plan." To fulfill this requirement, PFC Associates implemented the "Continuous Quality Improvement Program." Feirson invokes one aspect of the Program in which the Clinic, on a monthly

---

[2] Feirson has failed to raise the issue of whether a District regulation imposes such a duty—a footnote citing the regulation without explanation is insufficient.

basis, was to review "all charts with a particular 'high volume' or 'high risk' diagnosis." Feirson imagines that the chart reviews, which had not been done regularly, required the Physician Defendants to report ASP training injuries. Not so. The results from the chart reviews were to ensure the Clinic provided treatment that met "acceptable standards of medical care."

Finally, Mary Feirson's loss of consortium claims against the District and the Physician Defendants must fail because they depend on her husband's claims. *See Elliott v. Healthcare Corp.*, 629 A.2d 6, 10 (D.C. 1993).

The district court's grants of summary judgment are

*Affirmed*.

WILLIAMS, *Senior Circuit Judge*, concurring: I agree with the judgment and with the court's opinion on all matters but one. I take issue with the court's grounds for rejecting Feirson's second seizure claim: The court writes that "no evidence would support a finding that the instructors would not have stopped if Feirson asked them to do so." Maj. Op. at 9. The record is unclear on the matter. In the exercise, instructors formed a ring of police officers with shields around Feirson. The ring pushed Feirson back into the attack zone whenever he attempted to elude his attacker. This suggests that the instructors were prepared to compel Feirson's participation, regardless of his protests. And Feirson's supervisor had rejected his earlier effort to be excused from attending the exercise. Thus, I think a reasonable jury could infer that Feirson could not have induced the trainers to stop (short of a real or feigned collapse, or similar manifestation of serious injury).

Nonetheless, I don't believe this confinement was an invalid seizure under the Fourth Amendment. In any sort of military or quasi-military training, periods may arise when, as a practical matter, the nature of the training makes it impossible or at least extremely risky for trainees to leave; consider, for example, recruits under live machine gun fire in basic training. Although the trainee cannot unilaterally decide to exit the exercise, the resulting confinement is one to which the trainee agreed when he chose to go ahead with the exercise (or, in the case of the recruit, to join the military). Thus it is either a seizure made lawful by consent, or not a seizure at all within the meaning of the Fourth Amendment, a distinction of no consequence here.