# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 4, 2026

Lyle W. Cayce
Clerk

———————

No. 25-10259

———————

BRITTNEY KENNEDY, *Individually and as surviving spouse, on behalf of minor M.S.K. and as anticipated personal representative of* THE ESTATE OF MARQUIS KENNEDY,

*Plaintiff—Appellant*,

*versus*

CITY OF ARLINGTON, TEXAS; SHELLY BATEMAN; JONATHAN P. BUCEK; RICHARD COLEMAN; TYLER FERRELL; PATRICK KNIGHT; DAVID KURBINSKY; MICHAEL LEONESIO; LEONARD RAY; RONNIE MCCOY; BOBBY MUGUEZA; OFFICER NORWOOD; CONNOR SHANAHAN; SEAN WHEATLEY; JASTIN D. WILLIAMS; BRADLEY MCNULTY,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:24-CV-208

———————————————————————

Before HAYNES, DUNCAN, and RAMIREZ, *Circuit Judges*.
STUART KYLE DUNCAN, *Circuit Judge*:

Appellant Brittney Kennedy appeals the dismissal of constitutional claims she brought on behalf of her deceased husband, Marquis Kennedy, who suffered a cardiac arrest after a self-defense simulation for police-cadet

training. She claims the district court erred by concluding that the training exercise involved no constitutional seizure and that the officers owed Marquis no constitutional duty of medical care.

Marquis's death is a tragedy, above all for his surviving wife and child. Like the district court, however, we cannot find any plausible allegation that the defendants violated the Constitution. Accordingly, we AFFIRM.

I

In 2022, Marquis Kennedy ("Marquis") sought to become a police officer for Appellee City of Arlington (the "City"). After passing a pre-employment physical examination, he enrolled in the Arlington Police Academy. As part of his training program, Marquis had to complete a self-defense course called Gracie Survival Tactics ("GST"), which requires cadets to endure four consecutive four-minute self-defense scenarios against Gracie-trained Arlington police officers. The GST course is mandatory for all cadets.

Marquis participated in the self-defense simulation during his tenth week at the academy on Friday, September 23 around 10:00 a.m. According to Kennedy, the simulation required Marquis to submit to various "jiu-jitsu submission holds, choke holds, compression holds, punches and wrestling." Although Marquis complained repeatedly of lightheadedness, thirst, and fatigue, he was "denied water" and was not "permitted any breaks." Marquis continued to participate in the simulation, however, because he would fail and have to "repeat the entire physical training program" if he stopped.

Marquis's condition deteriorated as the simulation progressed. During the fourth and final self-defense scenario, Kennedy alleges that Marquis dropped an "officer in distress" card, signaling that he was in trouble and could not continue. She claims the instructors ignored the card,

continuing the simulation until it was clear that Marquis could not continue. The instructors then stopped the simulation and asked Marquis if he needed an ambulance. "Yes," he replied. At that time, Marquis was about fifteen minutes into the simulation.

Given Marquis's fatigued state, two individuals helped "carry [him] out of the room." They sat Marquis in the break room and gave him water. At 10:24 a.m., Officer Shelly Bateman called dispatch, requesting emergency medical services ("EMS") for Marquis, who appeared to be "a little overheated." But then Marquis "stopped breathing, lost consciousness, and fell off the chair, landing on his head." In response, Officer Bateman called dispatch at 10:28 a.m., stating that Marquis was "not breathing and that they ha[d] begun CPR and [we]re attempting to use the AED to revive him."

EMS arrived at 10:40 a.m. They immediately began lifesaving measures after determining Marquis "was suffering from respiratory failure." Ultimately, the first responders resuscitated Marquis using oral intubation. They then transported him to a hospital. Sadly, Marquis never regained consciousness and died two days later. The autopsy and death certificate list the cause of death as unknown but note that Marquis suffered a "cardiac arrest" and that there was "[n]o apparent trauma." The death certificate suggests that "atherosclerotic cardiovascular disease" likely caused Marquis's cardiac arrest.

Kennedy sued the City and all officers present at Marquis's training simulation under 42 U.S.C. § 1983. She claimed Marquis's instructors—Appellee Officers Jastin D. Williams, Jonathan Bucek, David Kurbinsky, and Bradley McNulty—violated Marquis's Fourth Amendment and Fourteenth Amendment rights. Kennedy also asserted

bystander-liability claims against eleven other Appellee officers[1] who were present for, but did not participate in, the simulation. On top of that, Kennedy claimed that all officers violated Marquis's Fourteenth Amendment rights by acting "with subjective deliberate indifference to [Marquis's] serious medical needs." Finally, Kennedy contended the City was liable for failing to train its officers to not use excessive force and to recognize when cadets are in medical distress.

The City and the individual officers moved to dismiss under Rule 12(b)(6). The City also submitted a video recording of the training simulation, which Kennedy viewed and relied on in drafting a supporting affidavit for her claims. The district court referred the motions to a magistrate judge, who concluded that the complaint failed to (1) plausibly allege a Fourth Amendment seizure; (2) state a Fourteenth Amendment substantive-due-process violation; or (3) establish any constitutional duty to provide medical care in an employment setting. The magistrate judge therefore held that qualified immunity applied and recommended dismissing all claims against the officers and the City. The district court adopted the magistrate judge's findings and conclusions in full.[2]

Kennedy appeals.

## II

The dismissal of Kennedy's claims under Rule 12(b)(6) is reviewed *de novo*. *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023). To survive a motion to

---

[1] Those officers include Shelly Bateman, Richard Coleman, Tyler Ferrell, Patrick Knight, Michael Leonesio, Leonard Ray, Ronnie McCoy, Bobby Mugueza, Officer Norwood, Connor Shanahan, and Sean Wheatley.

[2] Future references to the magistrate judge's findings, conclusions, and recommendations will therefore be attributed to the district court.

dismiss, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff." *White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021). But we need not "presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Harmon v. City of Arlington*, 16 F.4th 1159, 1162–63 (5th Cir. 2021) (quotation omitted).

## III

### A

We begin by addressing whether the district court properly considered the City's video recording when ruling on the motions to dismiss.

When evaluating a motion to dismiss, courts are usually confined to the complaint and its attachments. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008). But "[w]hen a defendant attaches documents to its motion that are referenced in the complaint and are central to the plaintiff's claims," then "the court can also properly consider those documents." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019). This principle applies equally to videos: When a plaintiff relies on and references video evidence "in their complaint and brief," Fifth Circuit "caselaw supports our consideration of the video." *Winder v. Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024) (per curiam).

Kennedy cites the City's recording of Marquis's training simulation in the operative complaint. And because Kennedy did not witness Marquis's training simulation, her claims against the officers rely heavily on an affidavit

in which she describes what she saw on the recording. As a result, the recording is "central to [Kennedy's] claims." *Inclusive Cmtys. Project*, 920 F.3d at 900. The district court therefore did not err in considering the video. *Winder*, 118 F.4th at 643.

B

Next, we consider whether the district court erred by holding that qualified immunity bars Kennedy's Fourth and Fourteenth Amendment claims against the four instructors.

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotations omitted). To overcome the defense of qualified immunity, a plaintiff must "plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (quoting *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)).

Qualified-immunity defenses are analyzed under a two-prong inquiry. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Courts may address the prongs "in either order" and may "resolve the case on a single prong." *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (quoting *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020)). Under the first prong, the plaintiff must plausibly allege that "[the officers] violated a federal statutory or constitutional right." *Ibid.* (internal quotations omitted). The second prong requires that the unlawfulness of the conduct be "clearly established at the time" of the alleged misconduct. *Ibid.* (citation omitted).

No. 25-10259

1

We begin with Kennedy's claim that the instructors violated Marquis's Fourth Amendment rights by seizing him through excessive force.

A Fourth Amendment seizure occurs when, under the totality of the circumstances, a reasonable person would believe he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The Supreme Court has long made clear that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement"; rather, a seizure occurs only when there is a termination of freedom of movement "through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989) (emphasis omitted). Put differently, a seizure requires the "detention or taking itself" be "willful." *Gorman v. Sharp*, 892 F.3d 172, 174 (5th Cir. 2018) (emphasis omitted) (quoting *Brower*, 489 U.S. at 596).

The district court held that Kennedy did not plausibly allege a seizure because the complaint lacked nonconclusory allegations suggesting that the instructors "intended to seize Marquis Kennedy." On appeal, Kennedy argues the district court erred in two ways. First, she disagrees with the court's reading of seizure law, claiming that a seizure requires only that the instructors "intended to commit the acts that resulted in the harm." In her view, because the officers intended to apply force to Marquis during the simulation, and because that force was excessive, the instructors violated his Fourth Amendment right "to be free from excessive force." Second, Kennedy argues that the instructors seized Marquis when they "continued to assault him" after he withdrew his consent. According to Kennedy, "Marquis revoked his consent when he dropped his 'officer in distress' card, which was designed for that very purpose."

We agree with the district court that Kennedy has not plausibly alleged a Fourth Amendment seizure. As a threshold matter, there is no "generic 'right' to be free from excessive force." *Graham v. Connor*, 490 U.S. 386, 393 (1989). Kennedy's conclusory suggestion to the contrary is foreclosed by Supreme Court precedent.

Similarly unavailing are Kennedy's intent- and consent-based arguments. Starting with intent, Kennedy does not plausibly allege that the instructors willfully intended to restrain Marquis during his training exercise. Our precedent makes this point clear. In *Gorman v. Sharp*, we reversed the denial of qualified immunity when an officer accidentally shot a co-instructor during a training exercise after forgetting to replace his real firearm with a dummy weapon. 892 F.3d at 175. Although the incident was "unquestionably tragic," *id.* at 173, we held that no seizure occurred because the shooting "was not 'willful[ly] performed,'" *id.* at 175 (alteration in original) (quoting *Brower*, 489 U.S. at 596). Indeed, the officer believed he was using a dummy firearm and pulled the trigger solely "to educate his audience as a firearms training instructor." *Ibid. Gorman* thus shows that mere intent to perform the act is not enough to effect a Fourth Amendment seizure.

That analysis controls here. Like the instructor in *Gorman*, the instructors running Marquis's training simulation did not intend to restrain or harm him. They applied force to Marquis for instructional purposes during a structured self-defense simulation. The complaint lacks nonconclusory facts suggesting otherwise. *Gorman* also squarely rejects Kennedy's contention that a seizure requires only an intent to "commit the act that resulted in the harm." Otherwise, *Gorman* would have come out the other way because the instructor there intended to pull the trigger. The complaint therefore fails to plausibly allege the willfulness necessary to establish a Fourth Amendment seizure.

Nor does the complaint plausibly allege that Marquis withdrew his consent during the simulation. Kennedy's main theory—that Marquis dropped an officer-in-distress card—is contradicted by the video recording. And as we noted in *Harmon v. City of Arlington*, when a video recording is "included in the pleadings" and "'blatantly contradict[s]'" the "factual allegations in the complaint," this court adopts the video's depiction of events, "viewed in the light most favorable to the plaintiff." 16 F.4th at 1163 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

Even through that favorable lens, Kennedy's theory is implausible. Although the audio is not perfect, the video clearly shows how Marquis's final self-defense scenario proceeded. The simulation begins, and the observing officers prompt Marquis to ask the approaching instructor for identification. Marquis does so. The instructor replies, "ID, sure man it's right here," offering an orange card. The instructor then begins punching Marquis as part of the simulation, and Marquis drops the ID to defend himself. Nothing in the video suggests—let alone supports—that Marquis withdrew his consent by dropping the ID. And nothing else in the complaint supports that Marquis withdrew his consent.

The D.C. Circuit has persuasively rejected Kennedy's other rationales for why Marquis "was not freely able to leave the training exercise." In *Feirson v. District of Columbia*, the D.C. Circuit held that a police officer was not seized during mandatory baton-training exercises, even though a reasonable person might have felt unable to disobey orders without jeopardizing their career. 506 F.3d 1063, 1067–68 (D.C. Cir. 2007). The court rejected the theory that the officer was "'seized' during the attack exercise because he could not stop it," emphasizing that the officer had "submitted to the exercise" and that nothing suggested the instructors would not have stopped had he asked. *Id.* at 1068.

So too here. Marquis voluntarily submitted to the training simulation. And Kennedy does not plausibly allege that the instructors would have refused to stop the simulation if asked. In fact, the record shows the opposite: the instructors *did* stop the simulation when Marquis could not continue. Like *Feirson*, Marquis consented to the simulation through voluntary submission.

The complaint itself confirms Marquis's voluntary participation. The City's website states that cadets should expect to undergo "Scenario Training" and "Physical Training and Defensive Tactics"—trainings that plainly encompass the simulation at issue. Marquis thus consented to instructional force as a condition of cadet training and prospective employment. Any limitation on Marquis's freedom of movement thus stemmed from his knowing and voluntary consent to be part of the training.

Because the complaint does not plausibly allege that the instructors willfully restrained Marquis's liberty during the simulation, it fails to state a claim for a Fourth Amendment seizure. The district court therefore properly dismissed Kennedy's Fourth Amendment excessive-force claims.

2

We turn to Kennedy's claim that the instructors violated Marquis's substantive-due-process right to bodily integrity.

"[T]he touchstone of due process is protection of the individual against arbitrary action of government." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (citation omitted). In "a constitutional sense," "'[a]rbitrary action' . . . encompasses 'only the most egregious official conduct,' namely that which 'shocks the conscience.'" *Slaughter v. Mayor & City Council*, 682 F.3d 317, 321 (4th Cir. 2012) (quoting *Lewis*, 523 U.S. at 846). That bar is exceedingly high, requiring "conduct intended to injure" that is "unjustifiable by any government interest." *Ibid.* (quoting *Lewis*, 523

U.S. at 849). Deliberate indifference may suffice in custodial settings with "pretrial detainees," but it is insufficient for "persons in an employment relationship with the government." *Ibid.*

As the Supreme Court has explained, "Neither the text nor the history of the Due Process Clause" suggests that a governmental employer has a "duty to provide its employees with a safe working environment." *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992). Consistent with *Collins*, the Fourth Circuit affirmed a dismissal of claims brought by the estate of a firefighter recruit who died in a live-burn training exercise. *Slaughter*, 682 F.3d at 323. "[B]ecause the complaint does not purport to allege that the Fire Department staged the live burn training exercise *with the purpose of causing harm to [the decedent] or to any other recruit*, it falls short of alleging a substantive due process violation in the context of the facts alleged." *Id.* at 319. Likewise, in *Carty v. Rodriguez*, we held that qualified immunity shielded state-trooper trainers when a trainee died following defensive-tactics drills, underscoring that the Constitution does not impose a duty to provide a safe training environment. 470 F. App'x 234, 236 n.5 (5th Cir. 2012) (per curiam).

Taken together, these precedents teach that, to state a due process claim, Kennedy had to allege more than an unsafe training environment. She had to plausibly allege that the instructors intended to harm Marquis. As we have already concluded, however, the complaint does not do that.

Furthermore, Kennedy argues only that various instructor actions demonstrate deliberate indifference. The complaint alleges the same. But because Marquis was a City employee voluntarily participating in workplace training, not a police suspect in custody, pleading deliberate indifference alone is insufficient. *Slaughter*, 682 F.3d at 321 (quoting *Lewis*, 523 U.S. at 846). At most, the allegations sound in negligence—a claim rooted in state

tort law, not constitutional due process. *Collins*, 503 U.S. at 127 n.10, 128; *see also Lewis*, 523 U.S. at 849.

The district court therefore properly dismissed Kennedy's bodily-integrity claim under the Fourteenth Amendment.

3

Finally, we consider Kennedy's other Fourteenth Amendment claim—that all the Appellee officers were deliberately indifferent toward Marquis's medical needs.

The Due Process Clause imposes a constitutional duty on the government to provide medical care only when it has restrained an individual's liberty such that they cannot care for themselves—typically through incarceration, detention, or institutionalization. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198–200 (1989).

Kennedy's medical-care claim relies predominately on her seizure theory, asserting that Marquis "enjoyed a constitutional right to medical care" when the instructors seized him. Given that asserted right, Kennedy alleges the officers failed to respond adequately to Marquis's medical distress, including by delaying the call for emergency medical services.

We have already rejected Kennedy's seizure theory above, however. And Marquis was not otherwise a detainee or in state custody. To the contrary, he was a police-academy cadet participating in a voluntary workplace training exercise. As *Collins* makes clear, government employees injured in the course of employment are not in custody or deprived of their liberty for Fourteenth Amendment purposes. 503 U.S. at 127–28. Absent a custodial arrangement or some other special relationship, allegations of delayed or inadequate medical response sound in state-tort law and negligence, not in substantive due process. *Ibid.*

Kennedy's deliberate-indifference claims therefore fail, and the district court properly dismissed them.

## C

Finally, we turn to Kennedy's derivative claims, which include (1) bystander liability against the observing officers for failing to intervene; and (2) municipal liability against the City for failing to train its officers to not use excessive force or to recognize when a cadet is in medical distress.

Bystander liability attaches only when an officer "(1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020) (citing *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013)). Because Kennedy has not plausibly alleged any constitutional violation, the eleven officers cannot be liable for failing to intervene. These claims necessarily fail.

The same is true for Kennedy's claims against the City because municipal liability also requires a predicate constitutional injury. *See, e.g.*, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."). But even if that weren't the case, Kennedy's claims would still fail because the *Collins* Court rejected *Monell* liability for workplace-safety-related harms. 503 U.S. at 128–29 (explaining that decisions like employee training should be made by "locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country").

No. 25-10259

Accordingly, the district court properly dismissed Kennedy's derivative § 1983 claims.

## IV

The district court's judgment is AFFIRMED.